**Ricky CRAWFORD, Plaintiff–Appellant,**

v.

**INDIANA DEPARTMENT OF CORRECTIONS, Defendant–Appellee.**

No. 96–3123.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1997.

Decided June 2, 1997.

John Emry (argued), Franklin, IN, for Plaintiff-Appellant.

Jon B. Laramore (argued), Office of the Attorney General, Indianapolis, IN, for Defendant-Appellee.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

The plaintiff, a former state prisoner, seeks damages from the state prison administration under the part of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, that governs the provision of public services. Title II, Subtitle A, 42 U.S.C. §§ 12131–12134. He also seeks damages under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, but this claim need not be discussed separately. The Rehabilitation Act is materially identical to and the model for the ADA, *Bryant v. Madigan,* 84 F.3d 246, 248 (7th Cir.1996); *McDonald v. Pennsylvania Dept. of Public Welfare,* 62 F.3d 92, 94 (3d Cir.1995); *Duffy v. Riveland,* 98 F.3d 447, 455 (9th Cir.1996), except that it is limited to programs that receive federal financial assistance—which the Indiana prison system admittedly does. Since the ADA has a broader scope, we shall confine our discussion to it.

The district court dismissed the suit on the pleadings, on the ground that the Act is inapplicable to prison inmates—a question of first impression in this circuit, having been expressly left open in *Bryant v. Madigan, supra,* and *Love v. Westville Correctional Center,* 103 F.3d 558, 559 (7th Cir.1996). The circuits that have addressed the question disagree about the proper answer. Compare *White v. Colorado,* 82 F.3d 364, 367 (10th Cir.1996) (holding that neither the ADA nor the Rehabilitation Act applies to prison employment), and *Torcasio v. Murray,* 57 F.3d 1340, 1344–52 (4th Cir.1995) (holding that the ADA's applicability to prisons is not clearly established, but strongly hinting that it is inapplicable), with *Duffy v. Riveland, supra,* 98 F.3d at 454–55 (holding the ADA and the Rehabilitation Act applicable); *Bonner v. Lewis,* 857 F.2d 559, 562 (9th Cir.1988) (holding Rehabilitation Act applicable); *Harris v. Thigpen,* 941 F.2d 1495, 1522 n. 41 (11th Cir.1991) (same); and *Gates v. Rowland,* 39 F.3d 1439, 1446 (9th Cir.1994) (same). So we are on our own. And all that we have to go on for facts is the complaint, according to which the plaintiff is blind and because of his blindness was denied access to a variety of programs, activities, and facilities at the prison that are routinely available to the prison's population, including educational programs, the library, and the dining hall.

The Americans with Disabilities Act confers rights on "qualified individual[s] with a disability" who are denied access to "services, programs, or activities of a public entity." 42 U.S.C. § 12132. (See 29 U.S.C. § 794(a) for the parallel language of the Rehabilitation Act.) A "qualified individual" is defined as someone who with or without a reasonable accommodation has the physical and mental capacity to participate in the program or activity in question, 42 U.S.C. § 12131(2); and in the present posture of this case we must assume that the plaintiff satisfies this criterion. The statute defines "public entity" as either a state or local government or any department or other instrumentality of a state or local government, so the Indiana Department of Corrections is covered. Incarceration itself is hardly a "program" or "activity" to which a disabled person might wish access, *Bryant v. Madigan, supra,* 84 F.3d at 249, but there is no doubt that an educational program is a program, and when it is provided by and in a state prison it is a program of a public entity. *Schroeder v. City of Chicago,* 927 F.2d 957, 962 (7th Cir.1991). The use of a library is, equally clearly, an activity, and so, only a little less clearly, is the use of the dining hall. *Love v. Westville Correctional Center, supra,* 103 F.3d at 559. So if the statute is read literally, the plaintiff has stated a claim under it. It might not be a good claim; the prison might be able to show that there was no reasonable accommodation that would have enabled the plaintiff to participate in the programs and activities in question or that making the necessary accommodation would place an undue burden on the prison system. *Id.* at 561; *Gates v. Rowland, supra,* 39 F.3d at 1446–48; cf. *Turner v. Safley,* 482 U.S. 78, 87, 107 S.Ct. 2254, 2260–61, 96 L.Ed.2d 64 (1987). But these things cannot be determined on the bare pleadings. If the statute is applicable to prisoners, the judgment for the defendant was premature and must be reversed.

The state concedes that the statute is applicable to prisons, as distinct from prisoners, and thus that its protections are applicable to

guards and other prison employees, as assumed in *Miller v. Illinois Dept. of Corrections,* 107 F.3d 483 (7th Cir.1997), and, by deeming a visit to a prison or a prisoner in the prison an "activity," to visitors as well. *Pack v. Arkansas Valley Correctional Facility,* 894 P.2d 34, 39 (Colo.App.1995). But the state asks us to draw the line at prisoners. The difficulty is that the statute furnishes us with no implement for drawing the line there. (See 28 C.F.R. § 35.102(a), a Department of Justice regulation that explains that Subpart A of the ADA is applicable to "all services, programs, and activities provided or made available by public entities," except certain public transportation services.) The only criterion of eligibility is that the individual be "qualified" in a sense unrelated to his jural status. Nothing in the legislative history indicates a desire to except prisons or prisoners. When the Americans with Disabilities Act was passed in 1990, the Rehabilitation Act—basically the same statute, only limited to programs receiving federal assistance, so that what the ADA did in essence was generalize the Rehabilitation Act to the entire economy—had been on the books for 17 years, and there were several cases holding that Act applicable to prisons and prisoners. *Bonner v. Lewis, supra; Harris v. Thigpen,* 727 F.Supp. 1564, 1582–83 (M.D.Ala.1990), aff'd. (on this point), 941 F.2d 1495 (11th Cir.1991); *Sites v. McKenzie,* 423 F.Supp. 1190, 1197 (N.D.W.V.1976). Nevertheless, Congress did not attempt, by altering the language that it was borrowing from the old statute as the template for the new one, to prevent the new one from being interpreted the same way the old one had been interpreted; nor did it amend the Rehabilitation Act to extinguish the old interpretation. Of course, Congress may not have been aware of the cases interpreting that Act. Still, the state is asking us to create an exception to these statutes on grounds of policy rather than to interpret ambiguous language, plug a gap, resolve a conflict, or, in short, "interpret" in any sense that makes the judge subservient to the expressed intentions and visible designs of the legislators. Realistically, the state is asking us to amend the two statutes.

Realistically, judges do this, or something like it, at times. An example much emphasized by the state in this case is the exclusion of prisoners employed in a prison from the minimum-wage and maximum-hours provisions of the Fair Labor Standards Act. See, e.g., *Vanskike v. Peters,* 974 F.2d 806 (7th Cir.1992), and other cases cited in *Bryant v. Madigan, supra,* 84 F.3d at 248; *Nicastro v. Reno,* 84 F.3d 1446 (D.C.Cir.1996) (per curiam); *Danneskjold v. Hausrath,* 82 F.3d 37 (2d Cir.1996). The FLSA defines "employee" sweepingly, see 29 U.S.C. § 203(d), (e)(1), (g); *Nationwide Mutual Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 1349–50, 117 L.Ed.2d 581 (1992) (remarking the "striking breadth" of the statutory definition); prisoners fall within its literal scope; and there is no express exception for or applicable to prisoners. There are a host of other examples of judge-made statutory exceptions so weakly rooted in the statute as to be fairly described as judicial amendments. A famous one is the *Feres* doctrine, which excludes military personnel from the Federal Tort Claims Act. *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *United States v. Johnson,* 481 U.S. 681, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987). Then there are the cases that construe the union-shop provision of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), which permits a collective bargaining agreement to require all employees in the bargaining unit to join the union, as requiring only that the employees must pay a portion of the union dues, without their having to join the union. E.g., *Radio Officers' Union v. NLRB,* 347 U.S. 17, 39–42, 74 S.Ct. 323, 335–37, 98 L.Ed. 455 (1954); *Communications Workers of America v. Beck,* 487 U.S. 735, 745, 108 S.Ct. 2641, 2648–49, 101 L.Ed.2d 634 (1988).

■ But courts do not create exceptions to statutes every time it seems that the legislature overlooked something. The legislative role of the courts is more confined than that of the legislature. E.g., *Seminole Tribe of Florida v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1133, 134 L.Ed.2d 252 (1996); *Commissioner v. Asphalt Products Co.,* 482 U.S. 117, 121, 107 S.Ct. 2275, 2277–78, 96 L.Ed.2d 97 (1987) (per curiam). The judges will create a statutory exception only when,

as in the union-shop cases, it is necessary to save the statute from being held unconstitutional (see also, e.g., *United States v. X–Citement Video, Inc.,* 513 U.S. 64, 73, 115 S.Ct. 464, 469–70, 130 L.Ed.2d 372 (1994)), or when they have great confidence that the legislature could not have meant what it seemed to say, as may be the explanation for the *Feres* doctrine. The first criterion is really included in the second; the legislature presumably would not have wanted the statute struck down in its entirety.

■ The state's first argument for a judge-made exception straddles the two criteria. The argument is that Congress cannot invade an "essential state function," such as prison administration, without a clear statement of its intent to invade it. "Clear statement" rules of statutory interpretation occupy an intermediate zone—some would say a no man's land—between interpretations motivated by desire to avoid a constitutional challenge and interpretations motivated by desire to give effect to the legislature's intentions. They give quasi-constitutional protection—quasi-constitutional because based on constitutional values but not an interpretation of the Constitution, and therefore subject to being overruled by Congress—to quasi-constitutional interests, such as the interest of the state in being allowed to perform the traditional core functions of state government without federal interference. See, e.g., *Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 2400–01, 115 L.Ed.2d 410 (1991); *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989); William N. Eskridge, Jr. & Philip P. Frickey, "Quasi–Constitutional Law: Clear Statement Rules as Constitutional Lawmaking," 45 *Vand.L.Rev.* 593, 597 (1992). A parallel to *that* clear-statement rule is the rule that statutes will be interpreted so far as possible to avoid infringing the prerogatives of tribal Indian governments. See, e.g., *United States v. Funmaker,* 10 F.3d 1327, 1330–31 (7th Cir.1993); *Reich v. Great Lakes Indian Fish & Wildlife Comm'n,* 4 F.3d 490, 493, 495 (7th Cir.1993). The tribal interest in autonomy, like the state interest in autonomy that undergirds the principle of federalism (both being forms of comity, the mutual re-spect of sovereigns), is not a constitutional right. But it has a kind of constitutional dignity that the courts go out of their way to protect, whether or not they are right in supposing that Congress would not want the interest impaired unless it made its intentions to do so unmistakable.

■ Prison administration is indeed a core function of state government, as is education. But the state's concession that the Americans with Disabilities Act applies to the prison's relations with its employees and visitors, as well as to the public schools, suggests that the clear-statement rule does not carry this particular core function of state government outside the scope of the Act. We doubt, moreover, that Congress could speak much more clearly than it did when it made the Act expressly applicable to all public entities and defined the term "public entity" to include every possible agency of state or local government. Maybe there is an inner core of sovereign functions, such as the balance of power between governor and state legislature, that if somehow imperiled by the ADA would be protected by the clear-statement rule, cf. *Gregory v. Ashcroft, supra,* 501 U.S. at 461–63, 111 S.Ct. at 2401–02; but the mere provision of public services, such as schools and prisons, is not within that inner core.

The second and as it seems to us firmer basis for judge-made exceptions to statutes is where the exception is necessary to save the statute from generating absurd consequences. E.g., *Public Citizen v. U.S. Department of Justice,* 491 U.S. 440, 454, 109 S.Ct. 2558, 2566–67, 105 L.Ed.2d 377 (1989); *Bryant v. Madigan, supra,* 84 F.3d at 248–49; *Merrill Lynch, Pierce, Fenner & Smith v. Lauer,* 49 F.3d 323, 326–27 (7th Cir.1995); Cass R. Sunstein, *Legal Reasoning and Political Conflict* 183 (1996). It is a firmer basis because it is more legitimately interpretive and escapes the criticism that it stretches the Constitution by giving quasi-constitutional status to principles such as "federalism" or "tribal autonomy" that may lurk in the interstices of the constitutional text but are not expressly protected. Interpreting—so not really amending—to avoid

absurdities recognizes what sophisticated students of interpretation have been saying for at least a century and a half, see Francis Lieber, *Legal and Political Hermeneutics* 28–29 (enlarged ed. 1839), that a text is merely a clue, though an essential one, to the meaning of a communication; that meaning is inferred from the text and its context rather than being "in" the text in some simple sense. Suppose *A* says to *B*, "please give me a cup of coffee," and *B* snatches a cup of coffee out of a stranger's hand and gives it to *A*. *B*'s literal interpretation of *A*'s statement would be incorrect, because it would ignore a context that includes a practice of respect for property rights. In the case of prisoners who work in the prison and want to be paid the minimum wage, the context of the word "employee" in the Fair Labor Standards Act includes a workplace setting intended not to provide the worker with the money he needs to support himself—the support is provided by the prison—but to punish or rehabilitate him, and a statute obviously intended not to punish or to rehabilitate, but rather to provide a living wage to a worker who depends upon a wage for his support. We know from the Thirteenth Amendment that it is permissible for government to subject people to involuntary servitude as punishment for crimes; and it would be absurd to think that involuntary servitude, the polite word for slavery, carried with it an entitlement to a living wage.

 It might seem absurd to apply the Americans with Disabilities Act to prisoners. Prisoners are not a favored group in society; the propensity of some of them to sue at the drop of a hat is well known; prison systems are strapped for funds; the practical effect of granting disabled prisoners rights of access that might require costly modifications of prison facilities might be the curtailment of educational, recreational, and rehabilitative programs for prisoners, in which event everyone might be worse off. But unlike the minimum-wage case, there is another side to the issue. The Americans with Disabilities Act was cast in terms not of subsidizing an interest group but of eliminating a form of discrimination that Congress considered unfair and even odious. See 42 U.S.C. §§ 12101(a)(2), (a)(3); H.R.Rep. No. 485(II),

101st Cong., 2d Sess. 22, 30, 42 (1990) U.S.Code Cong. & Admin.News 1990, pp. 267, 303, 311–12, 324. The Act assimilates the disabled to groups that by reason of sex, age, race, religion, nationality, or ethnic origin are believed to be victims of discrimination. Rights against discrimination are among the few rights that prisoners do not park at the prison gates. E.g., *Turner v. Safley, supra,* 482 U.S. at 84, 107 S.Ct. at 2259. Although the special conditions of the prison setting license a degree of discrimination that would not be tolerated in a free environment, *id.* at 84–91, 107 S.Ct. at 2259–63; *Bryant v. Madigan, supra,* 84 F.3d at 248, there is no general right of prison officials to discriminate against prisoners on grounds of race, sex, religion, and so forth. If a prison may not exclude blacks from the prison dining hall and force them to eat in their cells, and if Congress thinks that discriminating against a blind person is like discriminating against a black person, it is not obvious that the prison may exclude the blind person from the dining hall, unless allowing him to use the dining hall would place an undue burden on prison management.

Insofar as the Act is intended to "mainstream" disabled people, see H.R.Rep. No. 485(II), *supra,* at 35, its application to prisoners might produce some anomalies. The disabled prisoner might be on death row, or serving a life term without possibility of parole, though these would be reasons unrelated to any discrimination against the handicapped for denying the prisoner access to programs designed to help him become a productive member of society upon his release from prison. Most prisoners, in any event, are not executed, and are eventually released, as was the plaintiff in this case. They have the same interest in access to the programs, services, and activities available to the other inmates of their prison as disabled people on the outside have to the counterpart programs, services, and activities available to free people. They have no right to more services than the able-bodied inmates, but they have a right, if the Act is given its natural meaning, not to be treated even worse than those more fortunate inmates.

Of course the failure to exclude prisoners from the Act may well, despite what we have said, have been an oversight. But we do not have enough confidence that this is so to justify our making the exception ourselves when we have no statutory handle or any clue in the legislative history (the only clue—the judicial interpretation of the Rehabilitation Act at the time the ADA was passed—cuts against creating the exception) that might enable us to exercise a creativity fairly describable as interpretive rather than legislative.

[redacted] What we have said scotches the state's argument that the suit is barred by the Eleventh Amendment. Like the other antidiscrimination statutes, the Americans with Disabilities Act is an exercise of Congress's power under section 5 of the Fourteenth Amendment (as well as under the commerce clause, which is not excepted from the Eleventh Amendment) to enact legislation designed to enforce and bolster the substantive provisions of the amendment, in this case the equal protection clause. 42 U.S.C. §§ 12101(a)(7), (b)(4). The Eleventh Amendment does not insulate the states from suits in federal courts to enforce federal statutes enacted under the authority of the Fourteenth Amendment. *Seminole Tribe of Florida v. Florida, supra,* —— U.S. at ——, 116 S.Ct. at 1125; *Fitzpatrick v. Bitzer,* 427 U.S. 445, 453, 456, 96 S.Ct. 2666, 2670, 2671, 49 L.Ed.2d 614 (1976). Although the state argues that the ADA is outside the scope of section 5, that argument is refuted by our earlier discussion of Congress's concern that disabled persons are victims of discrimination. Invidious discrimination by governmental agencies, such as Indiana's prison system, violates the equal protection clause even if the discrimination is not racial, though racial discrimination was the original focus of the clause. In creating a remedy against such discrimination, Congress was acting well within its powers under section 5, as the courts have concluded with respect to the Age Discrimination in Employment Act, which is similar to the ADA in forbidding a form of discrimination remote from the contemplation of the framers of the Fourteenth Amendment. *EEOC v. County of Calumet,* 686 F.2d 1249, 1251–52 (7th Cir.1982); *EEOC v. Elrod,* 674 F.2d 601, 603–09 (7th Cir.1982); *Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 699–700 (1st Cir.1983).

[redacted] So the judgment dismissing the suit must be reversed, and the suit reinstated. This does not mean the plaintiff will prevail. Even if everything in the complaint is true, which we do not know, since the answer denies the principal allegations, the defendant may be able to show that there was no reasonable accommodation that would have enabled the plaintiff to participate in the programs or services that he complains about being excluded from, or may be able to show that any necessary accommodation would impose an undue burden on the prison system. Terms like "reasonable" and "undue" are relative to circumstances, and the circumstances of a prison are different from those of a school, an office, or a factory, as the Supreme Court has emphasized in the parallel setting of prisoners' constitutional rights. E.g., *Turner v. Safley, supra,* 482 U.S. at 84–91, 107 S.Ct. at 2259–63. The security concerns that the defendant rightly emphasizes in urging us to exclude prisoners from the protections of the Act are highly relevant to determining the feasibility of the accommodations that disabled prisoners need in order to have access to desired programs and services. All we hold is that a state prisoner can make out a prima facie case of a violation of the Americans with Disabilities Act.

REVERSED AND REMANDED.