Ardeshir **GOSHTASBY**,
**Plaintiff–Appellee,**

and

**United States of America,**
**Intervenor–Appellee,**

v.

**BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS,**
**Defendant–Appellant.**

No. 97–2297.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1997.

Decided April 13, 1998.

Lisa Kane (argued), John Green, Kane & Associates, Chicago, IL, for Plaintiff–Appellee.

Jeffrey J. Ward, Keck, Mahin & Cate, Carla J. Rozycki (argued), Jenner & Block, Norma W. Zeitler, McDermott, Will & Emery, Chicago, IL, for Defendant–Appellant.

Jessica Dunsay Silver, Seth M. Galanter (argued), Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, Thomas P. Walsh, Office of the United States Attorney, Civil Division, Chicago, IL, for Intervenor.

Cathy Ventrell–Monsees, American Association of Retired Persons, Washington, DC, for Amicus Curiae.

Before KANNE, ROVNER, and EVANS, Circuit Judges.

KANNE, Circuit Judge.

In an uphill battle, the Board of Trustees of the University of Illinois ("the University") contends that Congress did not abrogate the states' Eleventh Amendment immunity when it amended the Age Discrimination in Employment Act in 1974. *See* Fair Labor Standards Act Amendments of 1974, Pub.L. No. 93–259, § 28, 88 Stat. 74. The district court denied the University's motion to dismiss. Relying on a wealth of our precedent and our application of *City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), we affirm the district court's denial.

## I. HISTORY

Goshtasby began working at the University's Chicago campus as an assistant professor of engineering in 1989. In December 1994, the engineering department recommended him and three other candidates for tenure. In May 1995, the University officially denied him tenure and informed him that it would only issue him a terminal contract. Goshtasby was the only one of these candidates denied tenure. Goshtasby alleges that he performed his job satisfactorily and that he was qualified for his position. He also alleges that each of the tenured individuals was younger and less qualified than he. Goshtasby believes that his age was the motivating factor for this decision. He was 45.

On June 15, 1996, Goshtasby filed a complaint against the University alleging that he was discriminated against on the basis of his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* Goshtasby seeks damages and equitable relief.

On September 17, 1996, the University moved to dismiss the complaint as barred by the Eleventh Amendment. Relying on the Supreme Court's decision in *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the University contended that Congress' attempt to abrogate the states' sovereign immunity in the 1974 Amendment to the ADEA was unconstitutional. Specifically, it argued that "Article

I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction" in the Eleventh Amendment, *id.* at 73, 116 S.Ct. at 1132, and that Congress did not abrogate the University's Eleventh Amendment immunity pursuant to a valid exercise of power under § 5 of the Fourteenth Amendment when it extended the ADEA to the states, *see* Fair Labor Standards Act Amendments of 1974, § 28, 88 Stat. 74 (amending 29 U.S.C. § 630). Alternatively, the University moved to stay the proceedings in the district court pending an interlocutory appeal of the denial of the University's Eleventh Amendment defense.

The district court denied the University's motion to dismiss. *See Goshtasby v. University of Ill.–Chicago,* No. 96 C 4271, slip op. at 10, 1997 WL 367362 (N.D.Ill. May 15, 1997). In doing so, the court relied on the precedent of this Court and the majority of other courts that have considered this issue. *See id.* at 8–9.

■ The University appealed to this Court. We have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 under the collateral order doctrine of *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 145, 113 S.Ct. 684, 688, 121 L.Ed.2d 605 (1993). On May 29, 1997, the University filed a motion to stay proceedings pending appeal. Goshtasby then moved for summary affirmance of the district court's decision on June 16, 1997. After both parties responded to the respective motions, we denied Goshtasby's motion for summary affirmance and stayed proceedings in the district court pending this appeal. *See Goshtasby v. Board of Trustees of Univ. of Ill.,* 123 F.3d 427, 428 (7th Cir.1997).

## II. ANALYSIS

■ We review a district court's dismissal under Rule 12(b)(1) *de novo. See Selbe v. United States,* 130 F.3d 1265, 1266 (7th Cir. 1997); *Calderon v. United States,* 123 F.3d 947, 948 (7th Cir.1997).

The Eleventh Amendment to the Constitution states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Although the text of the Amendment appears to restrict only the federal courts' Article III diversity jurisdiction, the Supreme Court has interpreted this Amendment "to stand not so much for what it says, but for the presupposition ... which it confirms." *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991). "The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity." *Puerto Rico Aqueduct,* 506 U.S. at 146, 113 S.Ct. at 689. For over a century, the Supreme Court has interpreted the Amendment to deny the federal courts authority to entertain a suit brought by private parties against a state. *See Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1890).

 The Eleventh Amendment bar to suit, however, is not absolute. A state may consent to be sued in federal court, and in certain circumstances, Congress may abrogate the states' sovereign immunity. *See Seminole Tribe,* 517 U.S. at 63–66, 71 n. 15, 116 S.Ct. at 1128, 1131 n. 15; *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). In this case, both parties agree that the University has not consented to suit. Thus, we must evaluate whether Congress abrogated the states' immunity in a constitutionally acceptable manner.

██ To determine whether Congress abrogated the states' Eleventh Amendment immunity in enacting the ADEA, we must examine two issues: "first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,' and second, whether Congress has acted 'pursuant to a valid exercise of power.'" *Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. at 1123 (internal citations omitted) (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985)); *see also Dellmuth v. Muth,* 491 U.S. 223,

229–30, 109 S.Ct. 2397, 2400–02, 105 L.Ed.2d 181 (1989); *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 243, 105 S.Ct. 3142, 3147–48, 87 L.Ed.2d 171 (1985).

### A. *Intent to Abrogate*

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). When Congress enacted the ADEA in 1967, the statute applied only to private employers. *See EEOC v. Elrod,* 674 F.2d 601, 605–06 (7th Cir.1982). In 1974, Congress amended the statute to apply to states. *See* Fair Labor Standards Act Amendments of 1974, § 28, 88 Stat. 74. It did so by expanding the definition of "employer" to encompass "a State or political subdivision of a State and any agency or instrumentality of a State," *id.* § 28(a)(2), 88 Stat. 74 (amending 29 U.S.C. § 630(b)(2)), and by amending the term "employee" to include "employees subject to the civil service laws of a State government," *id.* § 28(a)(4), 88 Stat. 74 (amending 29 U.S.C. § 630(f)). The ADEA also explicitly stated that an employer who violates it is liable for legal and equitable relief. *See* 29 U.S.C. § 626(b), (c).

The University contends that Congress did not unequivocally express its intent to abrogate the states' immunity when it amended the ADEA. It interprets the Supreme Court's Eleventh Amendment jurisprudence to imply that the simple expansion of the definitions of "employer" and "employee" is insufficient to override the states' sovereign immunity. *See Dellmuth,* 491 U.S. at 231, 109 S.Ct. at 2402 (stressing that "imperfect confidence will not suffice"); *Atascadero State Hosp.,* 473 U.S. at 246, 105 S.Ct. at 3149 (holding that "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment").

We addressed this question directly in *Davidson v. Board of Governors of State Colleges & Univs.,* 920 F.2d 441, 443 (7th Cir.1990). After reviewing the relevant pro-

visions, we concluded that "[u]nless Congress had said in so many words that it was abrogating the states' sovereign immunity in age discrimination cases—and that degree of explicitness is not required . . .—it could not have made its desire to override the states' sovereign immunity clearer." *Id.* (citations omitted). Thus, we held that states and their agencies were amenable to suit under the ADEA notwithstanding the Eleventh Amendment. *See id.*; *accord Hurd v. Pittsburg State Univ.*, 29 F.3d 564, 564–65 (10th Cir.1994) (holding that Congress abrogated states' Eleventh Amendment immunity in ADEA's 1974 amendment); *Ramirez v. Puerto Rico Fire Serv.*, 715 F.2d 694, 700–01 (1st Cir.1983) (same).

▆▆▆ The University, however, requests that we reconsider our decision in *Davidson*. We require compelling reasons to overturn Circuit precedent. *See Mid–America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1364 (7th Cir.1996); *EEOC v. Metropolitan Educ. Enters.*, 60 F.3d 1225, 1228 (7th Cir.1995), *rev'd on other grounds*, —— U.S. ——, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997). Our general rule is to give considerable weight to our own decisions " 'unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling.' " *Haas v. Abrahamson*, 910 F.2d 384, 393 (7th Cir. 1990) (quoting *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir.1987)). But we are not absolutely bound by them and "must give fair consideration to any substantial argument that a litigant makes for overruling a previous decision." *Colby*, 811 F.2d at 1123.

The University interprets *Seminole Tribe*'s first prong to require Congress to speak with greater clarity in order to abrogate the states' sovereign immunity. As support of this "new strict view," it highlights two recent decisions from district courts that have concluded that the 1974 amendment to the ADEA did not satisfy this clarity requirement. *See Humenansky v. Board of Regents of the Univ. of Minn.*, 958 F.Supp. 439, 442 (D.Minn.1997); *Coger v. Board of Regents*, No. 89–2374–GA, slip op. at 8–9 (W.D.Tenn.

Jan. 2, 1997). Appeals are pending in both of these cases.

While it is true that the Supreme Court in *Seminole Tribe* took an "expansive view of sovereign immunity," *Gorka v. Sullivan*, 82 F.3d 772, 774 (7th Cir.1996), we cannot accept the University's contention that this decision altered the established standard used to determine whether Congress unequivocally expressed its intent to abrogate the states' sovereign immunity. The Supreme Court in *Seminole Tribe* simply recycled its well-established verbiage in stating that Congress must be " 'unmistakably clear.' " 517 U.S. at 54–56, 116 S.Ct. at 1123 (quoting *Dellmuth*, 491 U.S. at 228, 109 S.Ct. at 2400). The analysis was the same one federal courts have used for years. Moreover, subsequent decisions by district courts in other circuits that disagree with our holding in *Davidson*, like *Humenansky* and *Coger*, are not evidence of a stricter application of the "unmistakably clear" standard; rather, they demonstrate that reasonable minds may differ on what constitutes the requisite level of clarity.

Because the University does not present any other arguments to us on this issue, it has not provided us with a compelling reason why we should depart from our decision in *Davidson*. Thus, we reaffirm our position that Congress made its intention to abrogate the states' sovereign immunity unmistakably clear in the ADEA's 1974 amendment.

### B. *Power to Abrogate*

▆▆▆ The second inquiry under *Seminole Tribe* is whether "Congress has the power to abrogate unilaterally the States' immunity from suit." 517 U.S. at 59, 116 S.Ct. at 1125. Even after *Seminole Tribe*, "[t]he Eleventh Amendment does not insulate the states from suits in federal courts to enforce federal statutes enacted under the authority of the Fourteenth Amendment." *Crawford v. Indiana Dep't of Corrections*, 115 F.3d 481, 487 (7th Cir.1997).

▆▆▆ Section 1 of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws," and § 5

grants Congress broad power to effectuate the goals of the amendment.

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce the submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Ex parte Virginia,* 100 U.S. 339, 345–46, 25 L.Ed. 676 (1879). The scope of Congress' power under § 5 is equivalent to that under the Necessary and Proper Clause, U.S. Const. Art. 1 § 8, cl. 18. *See Katzenbach v. Morgan,* 384 U.S. 641, 650, 86 S.Ct. at 1723 (1966). The test for whether legislation is appropriate under the Necessary and Proper Clause was established in *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819):

> Let the end be legitimate, let it be within the scope of the [C]onstitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist[ent] with the letter and spirit of the [C]onstitution, are constitutional.

Thus, a statute is "appropriate legislation" under § 5 of the Fourteenth Amendment if the enactment is " 'plainly adapted' " to enforcing the Equal Protection Clause and "not prohibited by but is consistent with 'the letter and spirit of the [C]onstitution.' " *Morgan,* 384 U.S. at 651, 86 S.Ct. at 1724 (quoting *M'Culloch,* 17 U.S. at 421).

We decided whether Congress used its § 5 enforcement power to abrogate the states' sovereign immunity in its enactment of the 1974 amendment to the *ADEA in EEOC v. Elrod,* 674 F.2d 601, 604–09 (7th Cir.1982). The 1974 amendment does not state that Congress enacted it pursuant to § 5 of the Fourteenth Amendment. In *Elrod,* we evaluated the structure of the ADEA and its 1974 amendment, the legislative history of the statute and this amendment, and the statute's placement within the wider array of federal anti-discrimination law to determine whether Congress relied on its § 5 enforce-

ment power to enact the 1974 amendment to the ADEA. We concluded that the objective of the 1974 amendment "was to prohibit arbitrary, discriminatory government conduct that is the very essence of the guarantee of 'equal protection of the laws' of the Fourteenth Amendment." *Id.* at 604. Thus, we held that Congress exercised its enforcement power under § 5 of the Fourteenth Amendment in enacting the 1974 amendment and that Congress did not overstep its enforcement power in that enactment. *See id.* at 609; *see also Davidson,* 920 F.2d at 443; *Heiar v. Crawford County,* 746 F.2d 1190, 1193–94 (7th Cir.1984).

The University levies two attacks against our holding in *Elrod.* First, it argues that we erred by using the wrong test to determine whether Congress acted pursuant to its § 5 enforcement power. Second, it relies on the Supreme Court's recent decision in *City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624, to assert that the 1974 amendment is too broad to be enacted pursuant to Congress' § 5 enforcement power.

### 1.

The University believes that we were too swift to attribute to Congress the use of its § 5 enforcement power when Congress did not expressly state it was using that constitutional grounding. It insists that we reverse our decision in *Elrod.* To succeed, it must provide us with a compelling reason to overturn our precedent. *See Mid–America Tablewares,* 100 F.3d at 1364; *Metropolitan Educ. Enters.,* 60 F.3d at 1228.

The University contends that the proper inquiry is whether Congress in fact enacted the statute pursuant to that power. As support for its argument, the University relies on *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) and *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). In *Pennhurst,* the Supreme Court noted that courts should proceed cautiously before determining Congress' intent to act under the Fourteenth Amendment. The exact statement was that "we should not quickly attribute to Congress an unstated intent to act

under its authority to enforce the Fourteenth Amendment." 451 U.S. at 16, 101 S.Ct. at 1539. According to the University, *Pennhurst*'s cautionary language and *Gregory*'s recitation of it confirms that we erred in *Elrod*. *See Gregory*, 501 U.S. at 469, 111 S.Ct. at 2405–06.

In *Elrod*, we did not ask whether Congress made some "talismanic intoning of the amendment." 674 F.2d at 608. "Rather, the inquiry [was] whether the *objectives* of the legislation [were] within Congress' power under the amendment." *Id.* We distinguished the *Pennhurst* analysis by stressing that the issue in that case was one of statutory construction while the issue in *Elrod* was one of congressional authority to legislate. *See id.* at 608 n. 8. Thus, we concluded that this dicta from the Supreme Court did not alter the analysis used to determine whether Congress enacted legislation pursuant to § 5 of the Fourteenth Amendment. *See id.*

We did not err in determining that *Pennhurst* was inapposite to an inquiry into a statute's constitutional grounding.

> [T]he question in *Pennhurst* was whether Congress intended a particular result, regardless of the constitutional grant of power under which it [was en]acted. In the present inquiry, by contrast, the intended result (of subjecting States to suit for violations of [ADEA]'s substantive provisions) is clear, and the grant of power under which Congress acted is at issue.

*Doe v. University of Ill.*, 138 F.3d 653, 658 (7th Cir.1998). It has long been the Supreme Court's position that "the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948); *see also EEOC v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983) (stating that Congress need not "anywhere recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection' "). The University's reliance on *Pennhurst* and *Gregory* is misplaced. Despite the fact that *Pennhurst* and *Gregory* warned us to proceed cautiously before determining Congress' intent when performing statutory interpretation to a stat-

ute enacted under the Fourteenth Amendment, the rule remains that Congress need not use magic words to exercise its enforcement power under § 5 of the Fourteenth Amendment.

The University also argues that the Supreme Court in *Seminole Tribe* altered the test from whether the statute is within Congress' power under the Fourteenth Amendment to whether Congress in fact enacted the statute pursuant to that power. The second prong of the *Seminole Tribe* test is whether Congress enacted the statute pursuant to a valid exercise of power. *See* 517 U.S. at 58–60, 116 S.Ct. at 1125. This phrasing of the question does not alter the analysis used to decide in which clause of the Constitution Congress grounded the statute. "*Seminole Tribe* says nothing about the situation presented here where there is a question about whether Congress legislated pursuant to an unstated Constitutional provision." *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 841–42 (6th Cir.1997). The circuits that have addressed this issue are uniform in this conclusion. *See CSX Transp. Inc. v. Board of Public Works of W. Va.*, 138 F.3d 537, 539–40 (4th Cir.1998); *Doe*, 138 F.3d at 659–61; *Sacred Heart Hosp. v. Pennsylvania (In re Sacred Heart Hosp.)*, 133 F.3d 237, 244 (3rd Cir.1998); *Clark v. California*, 123 F.3d 1267, 1271 (9th Cir.1997); *Mills v. Maine*, 118 F.3d 37, 43 (1st Cir.1997); *Hurd v. Pittsburg State Univ.*, 109 F.3d 1540, 1545 (10th Cir.1997); *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir.1997); *Timmer*, 104 F.3d at 841–42. *Seminole Tribe* did not alter the standard for determining whether Congress enacted legislation pursuant to § 5 of the Fourteenth Amendment.

■ That being said, the University has failed to provide us with a compelling reason to overturn *Elrod*. Because the proper inquiry for whether Congress used its § 5 enforcement power in enacting a statute remains the same after the Supreme Court's decisions in *Pennhurst*, *Gregory*, and *Seminole Tribe*, we reaffirm our decision in *Elrod* that Congress relied on its § 5 enforcement authority in passing the 1974 amendment to the ADEA.

**2.**

The University argues in the alternative that the 1974 amendment of the ADEA exceeded Congress' power under § 5 of the Fourteenth Amendment. Even though we have repeatedly held that the amendment was appropriate legislation under Congress' § 5 power, *see Crawford*, 115 F.3d at 487; *Davidson*, 920 F.2d at 443; *EEOC v. County of Calumet*, 686 F.2d 1249, 1252 (7th Cir. 1982), the University contends that the Supreme Court's intervening decision in *City of Boerne*, — U.S. at ——, 117 S.Ct. at 2157, establishes that Congress oversteps its authority when it creates substantive rights which have not been previously recognized by the Supreme Court.

**a.**

In *City of Boerne*, the Supreme Court considered the constitutionality of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.* Congress enacted RFRA in response to the Supreme Court's decision in *Employment Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith*, the Court held that the Free Exercise Clause does not require states to make exceptions to neutral and generally applicable laws even when those laws significantly burden religious practices. *See id.* at 887, 110 S.Ct. at 1604–05. Through RFRA, Congress attempted to circumvent *Smith's* holding legislatively by imposing a requirement that laws which substantially burden a person's exercise of religion must be justified as furthering a compelling state interest and as the least restrictive means of doing so. *See* 42 U.S.C. § 2000bb–1.

The Court in *City of Boerne* held that RFRA was an unconstitutional exercise of Congress' § 5 power because it was "so out of proportion" to the problems which it identified that the act could not be viewed as enforcing the provisions of the Fourteenth Amendment. — U.S. at ——, 117 S.Ct. at 2170. Three separate findings of the Court buttressed the Court's holding. First, the Court found that there was no "pattern or practice of unconstitutional conduct under the Free Exercise Clause as interpreted in

*Smith*." *Id.* at ——, 117 S.Ct. at 2171. Second, it found that RFRA imposed "the most demanding test known to constitutional law." *Id.* In the Court's view, this standard created a likelihood of invalidating many state laws. *See id.* Third, the Court found that RFRA "contradicts vital principles necessary to maintain separation of powers and the federal balance" because it is such a sweeping, direct response by Congress to the Court's interpretation of the First Amendment that the Act may be interpreted as an attempt to expand the substantive meaning of the Fourteenth Amendment. *See id.* at ——, 117 S.Ct. at 2172.

In its analysis, the Supreme Court in *City of Boerne* provided us with additional guidance in how to determine whether an act is appropriate legislation under Congress' § 5 enforcement power. The critical question remains whether the act remedies constitutional violations or whether it imposes new substantive constitutional rights through legislation. Legislation which deters or remedies constitutional violations falls within "the sweep of Congress' enforcement power." *Id.* at ——, 117 S.Ct. at 2163; *see also South Carolina v. Katzenbach*, 383 U.S. 301, 316, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966) (describing Congress' power to enforce the provisions of the Fourteenth Amendment as remedial). But "Congress does not enforce a constitutional right by changing what the right is. It has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation." *City of Boerne*, — U.S. at ——, 117 S.Ct. at 2164. For an act to be remedial, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect." *Id.* at ——, 117 S.Ct. at 2164.

**b.**

The University interprets *City of Boerne* as concluding that Congress' § 5 power allows it to enforce the substantive provisions of the Fourteenth Amendment like the Equal Protection Clause only if the Supreme Court has previously recognized the substantive

right which Congress seeks to enforce. *See* —— U.S. at ——, 117 S.Ct. at 2167. It contends that Congress acted beyond its § 5 enforcement power when extending the ADEA to the states because the Supreme Court has never recognized protection from age discrimination as a substantive right enforceable through the Equal Protection Clause.

As support for its argument, the University directs our attention to the Supreme Court's holdings in *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam), *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), and the dissent in *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). In *Murgia,* the Court considered the constitutionality of a Massachusetts law requiring mandatory retirement for police officers at age 50. The Court refused to apply strict scrutiny in evaluating the statute, finding both that older persons do not constitute a suspect class and employment is not fundamental right affected by the state's action. *See* 427 U.S. at 313, 96 S.Ct. at 2566–67. Applying the rational basis standard of review, the Court held the statute constitutional. *See id.* at 314–17, 96 S.Ct. at 2567–69. In *Bradley,* the Court upheld mandatory requirement at age 60 for foreign services employees. *See* 440 U.S. at 112, 99 S.Ct. at 950. In doing so, the Court extended its rational basis standard of review to Fifth Amendment equal protection challenges based on age discrimination. *See id.* at 97, 99 S.Ct. at 942–43. Finally, in his dissent in *Wyoming,* Chief Justice Burger argued that the government could not support the ADEA on the ground that Congress was exercising its § 5 enforcement power because the Supreme Court has never found a class of older citizens to be constitutionally protected. *See* 460 U.S. at 260–61 & n. 7, 103 S.Ct. at 1072–73 & n. 7 (Burger, C.J., dissenting)[1].

In *Elrod,* we rejected the contention that Congress cannot rely on its § 5 enforcement power to legislate a stricter standard of conduct when the Supreme Court declined to use a suspect classification analysis. *See* 674 F.2d at 607 n. 6. There, we stated that:

Such a conclusion "would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the 'majestic generalities' of § 1 of the Amendment."

*Id.* (quoting *Morgan,* 384 U.S. at 648–49, 86 S.Ct. at 1722 (citations omitted)).

We reaffirm that position today. The fact that age is not a suspect classification does not foreclose Congress from enforcing the Equal Protection Clause through an enactment protecting against arbitrary and invidious age discrimination. In *City of Boerne,* the Court confirmed that "sec. 5 is 'a positive grant of legislative power' to Congress." —— U.S. at ——, 117 S.Ct. at 2163 (quoting *Morgan,* 384 U.S. at 651, 86 S.Ct. at 1723). Under this power, Congress may provide remedies for violations of the Equal Protection Clause. *See United States v. Price,* 383 U.S. 787, 789, 86 S.Ct. 1152, 1154, 16 L.Ed.2d 267 (1966); *Ex Parte Virginia,* 100 U.S. at 345. We view the Supreme Court's decisions in *Bradley* and *Murgia* as conceding *sub silentio* that the Equal Protection Clause protects against age discrimination. If the Equal Protection Clause did not protect against age discrimination, the Court would have dismissed these suits as beyond the scope of the Fourteenth Amendment. By determining which standard of review applied and addressing the merits of the allegations, the

---

1. The majority in *Wyoming* did not address the question of whether Congress enacted the ADEA pursuant to § 5 of the Fourteenth Amendment. It ended its analysis after concluding that the extension of the ADEA to cover state and local governments was a valid exercise of Congress' power under the Commerce Clause. *See id.* at 243, 103 S.Ct. at 1064. The majority did not need to address the Fourteenth Amendment question because Wyoming argued that the appli-

cation of the ADEA to the states was precluded by the constraints that the Tenth Amendment imposed on Congress' commerce powers. *See id.* at 236, 103 S.Ct. at 1060. Once it confirmed that application of the ADEA did not violate the Tenth Amendment's constraints on the Commerce Clause, the Court had no reason to reach the Fourteenth Amendment issue. *See id.* at 243, 103 S.Ct. at 1064.

Court implicitly recognized that the Equal Protection Clause encompassed protection for this form of discrimination. *See Bradley,* 440 U.S. at 97, 99 S.Ct. at 942–43; *Murgia,* 427 U.S. at 313, 96 S.Ct. at 2566–67. Thus, we cannot accept the University's argument that the Congress' § 5 power is limited to protecting only those classes of individuals entitled to heightened levels of scrutiny.

 The Supreme Court's equal protection jurisprudence is not confined to traditional suspect or quasi-suspect classifications. *See Mills,* 118 F.3d at 46. "The purpose of the [E]qual [P]rotection [C]lause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sunday Lake Iron Co. v. Wakefield Township,* 247 U.S. 350, 352, 38 S.Ct. 495, 495, 62 L.Ed. 1154 (1918); *see also City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3253–54, 87 L.Ed.2d 313 (1985) (emphasizing that the Equal Protection Clause ensures that all persons similarly situated are treated alike). Discrimination on the basis of age is subject to rational-basis review, *see Gregory,* 501 U.S. at 470, 111 S.Ct. at 2406, and "arbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review." *Bankers Life & Cas. Co. v. Crenshaw,* 486 U.S. 71, 83, 108 S.Ct. 1645, 1653, 100 L.Ed.2d 62 (1988); *see also Crawford,* 115 F.3d at 487 (stressing that invidious discrimination by governmental agencies violates the Equal Protection Clause even if the discrimination is not racial). Congress does not extend beyond its § 5 enforcement power by enacting legislation ensuring equal protection for individuals who do not comprise a suspect class.

### c.

 Finally, the University argues that § 5 cannot support the 1974 amendment to the ADEA because the act is so out of proportion to the problem which the ADEA identified that the act is substantive in its operation and effect. *See City of Boerne,* ——

U.S. at ——, 117 S.Ct. at 2164. In examining the proportionality of the act, we focus on "the extent of the threatened constitutional violations, and the scope of the steps provided in the legislation to remedy or prevent such violations." *Coolbaugh v. Louisiana,* 136 F.3d 430, 435 (5th Cir.1998).

 To determine the extent of the threatened constitutional violations, we first turn to Congress' findings in the ADEA which detail the evil Congress was addressing. Specifically, Congress found that:

(1) in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;

(2) the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;

(3) the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;

(4) the existence in industries affecting commerce, of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce.

29 U.S.C. § 621(a). Because "[i]t is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,'" *City of Boerne,* —— U.S. at ——, 117 S.Ct. at 2172 (quoting *Morgan,* 384 U.S. at 651, 86 S.Ct. at 1724), we afford these conclusions considerable deference.

Unlike the statute at issue in *City of Boerne,* which the Court determined lacked modern examples of intentional discrimination, *see* —— U.S. at ——, 117 S.Ct. at 2169, the evidence before Congress established that qualified workers were being fired, not hired, and paid less because of their age. After "extensive factfinding undertaken by the Executive Branch and Congress" of age

discrimination in employment, *Wyoming,* 460 U.S. at 230–31, 103 S.Ct. at 1057, Congress found that "older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993). Congress also found that age generally was not a reliable predictor of ability. In fact, "the available empirical evidence demonstrated that ..., as an overall matter, the performance of older workers was at least as good as that of younger workers." *Wyoming,* 460 U.S. at 231, 103 S.Ct. at 1057–58.

The evidence also indicated that employers used age arbitrarily as a proxy for ability. *See id.; see also* Secretary of the United States Department of Labor, *The Older American Worker: Age Discrimination in Employment* 7–8, 21 (1965). Finally, Congress subsequently established that these same conditions existed in the public sector. See S.Rep. No. 846, 93d Cong., 2d Sess. 112 (1974); Senate Special Comm. on Aging, *Improving the Age Discrimination Law,* 93d Cong., 1st Sess. 14 (Comm. Print 1973); 118 Cong. Rec. 7,745 (1972) (remarks of Sen. Bentsen).

Given the amount of deference that we afford Congress' findings, we agree with our earlier decisions that a firm basis in fact exists for Congress to conclude that much of the "common practice" of using age classifications in employment was "arbitrary" and thus unconstitutional even under a rational basis standard of review.

The remaining portion of our inquiry is whether the scope of the ADEA is so "sweeping" that the statute is not proportional to the evil Congress sought to address. *See Coolbaugh,* 136 F.3d 430, 437–38. The purpose of the ADEA is "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). The ADEA attempts to redress and prevent discrimination and stereotyping of older Americans by requiring that determinations be based on merit. *See Hazen Paper Co.,* 507 U.S. at 611, 113 S.Ct. at 1706 ("The employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly.").

Thus, the ADEA requires personalized determinations based on facts. *Id.; Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 422–23, 105 S.Ct. 2743, 2755–56, 86 L.Ed.2d 321 (1985). If however, youth is a bona fide occupational qualification that is reasonably necessary to the normal operation of the particular business, an employer may use age as a criterion for employment decisions. *See* 29 U.S.C. § 623(f)(1).

Again, unlike the statute at issue in *City of Boerne,* which imposed "the most demanding test known to constitutional law," *see* —— U.S. at ——, 117 S.Ct. at 2171, the ADEA is narrowly drawn to protect older citizens from arbitrary and capricious action by the state. *See County of Calumet,* 686 F.2d at 1252; *Elrod,* 674 F.2d at 611–12. The ADEA, as applied by the courts, ferrets out instances of arbitrary age discrimination. While the ADEA may prohibit some conduct which is not unconstitutional, "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." —— U.S. at ——, 117 S.Ct. at 2163. Thus, even after the Supreme Court's refinement of our approach to determining whether Congress overstepped its enforcement power in enacting a statute in *City of Boerne,* we agree with our earlier assessments that the ADEA is appropriate legislation under Congress' § 5 enforcement power.

Because we hold that the ADEA is a proper exercise of Congress' § 5 enforcement power under the Fourteenth Amendment, Congress abrogated the University's Eleventh Amendment immunity from suit. We therefore AFFIRM the district court's denial of the University's motion to dismiss.