Dalvan M. COGER; Joseph K. Davis; Carolyn Thorpe Furr; Lucille Golightly; Thomas M. Hughes; Janie S. Knight; Charles E. Long, Jr.; Harry Richard Mahood; Ramona Madson Mahood; Robert Marshall; Betty Hull Owen; June Rose Richie; Steve Scesa; Charles R. Schroeder; Robert A. Snyder; Bob J. Tucker; Sharon L. Van Oteghen, Plaintiffs–Appellants,

William Welch, Plaintiff,

United States of America, Intervenor,

v.

**BOARD OF REGENTS OF THE STATE OF TENNESSEE, A Subdivision of the State of Tennessee; Memphis State University, An Institution operated by the State Board of Regents; Thomas G. Carpenter, Individually and as President of Memphis State University; Victor E.**

---

Feisal, Individually and as Vice–President of Academic Affairs at Memphis State University, Defendants–Appellees.

No. 97–5134.

United States Court of Appeals,
Sixth Circuit.

Argued April 30, 1998.

Decided Aug. 17, 1998.

Donald A. Donati (argued and briefed), Jeffery L. Atchley (briefed), Donati & Associates, Memphis, TN, for Plaintiffs–Appellants.

Douglas A. Hedin (briefed), Law Office of Douglas A. Hedin, Minneapolis, MN, for National Employees Lawyers Ass'n.

Thomas W. Osborne (briefed), American Association of Retired Persons, Washington, DC, for American Association of Retired Persons.

Sheryl H. Lipman (briefed), Burch, Porter & Johnson, Memphis, TN, Michael E. Moore (argued and briefed), Albert K. Cocke, Office of the Attorney General, Criminal Justice Division, Nashville, TN, for Board of Regents of the State of Tenn.

Sheryl H. Lipman (briefed), Burch, Porter & Johnson, Memphis, TN, Albert K. Cocke,

Office of the Attorney General, Criminal Justice Division, Nashville, TN, for Memphis State University and Thomas G. Carpenter.

Albert K. Cocke, Office of the Attorney General, Criminal Justice Division, Nashville, TN, for Victor E. Feisal.

Seth M. Galanter (argued and briefed), U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for United States of America.

Jeffrey S. Sutton (argued and briefed), State Solicitor, Columbus, OH, Jack W. Decker (briefed), Office of the Attorney General, Employment Law Section, Columbus, OH, for State of Ohio.

Before: JONES, MOORE, and COLE, Circuit Judges.

## OPINION

COLE, Circuit Judge.

This appeal presents a single issue: are states immune from suits brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, on the basis of Eleventh Amendment immunity? This issue requires us to consider, in light of the Supreme Court's decisions in *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) and *City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the following two questions: (1) whether Congress expressed its intent to abrogate the states' Eleventh Amendment immunity in ADEA actions; and, if so, (2) whether Congress acted pursuant to a valid exercise of its enforcement power under Section 5 of the Fourteenth Amendment.

Upon consideration of this case, the district court determined that the ADEA did not abrogate the states' Eleventh Amendment immunity and, accordingly, dismissed the ADEA suit at issue on the basis of that immunity. We disagree with the district court and conclude that: (1) Congress un-equivocally expressed its intent to abrogate the states' Eleventh Amendment immunity in ADEA suits; and, in so doing, (2) Congress acted pursuant to a valid exercise of its Section 5 authority to enforce the Equal Protection Clause of the Fourteenth Amendment. Because the district court erred in dismissing the underlying cause, we **REVERSE** and **REMAND** for further proceedings in accordance with this opinion.

### I.

This ADEA action was brought in 1989 by seventeen senior faculty members of Memphis State University (now known as the University of Memphis) who were employed in ten different departments of the university. The plaintiffs ("Faculty Members") asserted claims of individual disparate treatment, as well as claims of disparate impact and pattern or practice discrimination in violation of the ADEA. The Faculty Members specifically challenged the university's salary increase and faculty evaluation program as being used discriminatorily against older faculty.

After discovery by both sides, the district court conducted a bench trial beginning in December of 1993, which took place sporadically over the course of the next five months. Upon the conclusion of the Faculty Members' proof in May 1994, the defendants (collectively, "the University") filed motions in June of 1994 pursuant to Fed.R.Civ.P. 52(c) for judgment on partial findings.[1] On May 24, 1996, the district court entered an order denying in part and granting in part the motion for partial findings. The district court granted the motion as to eight of the Faculty Members on their individual disparate treatment claims and denied the motion as to all other claims.

At about this time in the proceedings, in March 1996, the Supreme Court decided *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), in which it

---

1. Fed.R.Civ.P. 52(c) provides: "If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the control-ling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule."

addressed the issue of the states' Eleventh Amendment immunity from suit. In September of 1996, the University filed a motion to dismiss the action pursuant to Fed. R.Civ.P. 12(b)(1) (lack of subject matter jurisdiction) and Fed.R.Civ.P. 12(b)(6) (failure to state a claim for which relief may be granted) based on its claim of Eleventh Amendment immunity from suit. On January 2, 1997, without continuing the trial to hear the University's proof, the district court entered an order dismissing the ADEA action in its entirety on the basis that the State of Tennessee enjoyed Eleventh Amendment immunity against ADEA actions.

The Faculty Members then filed a timely notice of appeal.

## II.

■ We review de novo a district court's dismissal of a suit for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). *See Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2409, 138 L.Ed.2d 175 (1997). We must construe the complaint in the light most favorable to the plaintiff, accept the complaint's factual allegations as true, and determine whether it is beyond a doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Id.*

■ In addition, we review de novo a district court's dismissal of a case pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. *See Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1248 (6th Cir.1996).

## III.

### A. The Eleventh Amendment and *Seminole Tribe*

■ Through its provision of sovereign immunity, the Eleventh Amendment to the

United States Constitution denies the federal courts jurisdiction to entertain a suit brought by an individual against a state. *See Seminole Tribe*, 517 U.S. at 54, 116 S.Ct. 1114; *Hans v. Louisiana*, 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. However, there are exceptions to the states' sovereign immunity. Congress may abrogate the states' Eleventh Amendment sovereign immunity pursuant to Section 5 of the Fourteenth Amendment,[2] which provides Congress with the power to enforce the Fourteenth Amendment. *Id.* 116 S.Ct. at 1123. Among the provisions of the Fourteenth Amendment is the Equal Protection Clause.[3] *See* U.S. Const. amend. XIV, § 1.

■ In *Seminole Tribe*, the Supreme Court established a two-part inquiry for determining whether Congress abrogated the states' sovereign immunity when enacting a particular statute. *See* 517 U.S. at 55, 72–73, 116 S.Ct. 1114. The Court held that, absent a state's waiver, states retain their sovereign immunity unless: (1) Congress unequivocally expressed its intent to abrogate the immunity; and (2) Congress acted pursuant to a valid exercise of its enforcement power under Section 5 of the Fourteenth Amendment. *Id.; see also Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 837, 838 (6th Cir. 1997).

In order to satisfy the first *Seminole Tribe* requirement, Congress must make its intent

---

2. Section 5 of the Fourteenth Amendment provides: "The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

3. Section 1 of the Fourteenth Amendment includes the Equal Protection Clause and provides:
All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the

State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws.*
U.S. Const. amend. XIV, § 1 (emphasis added).

to abrogate the states' immunity "unmistakably clear." *Seminole Tribe*, 517 U.S. at 56, 116 S.Ct. 1114 (quotation and citation omitted). To satisfy the second requirement, Congress must act "pursuant to a constitutional provision granting Congress the power to abrogate." *Id.* at 59, 116 S.Ct. 1114. Because Section 5 of the Fourteenth Amendment is the only constitutional provision recognized by the Supreme Court as granting Congress the power to abrogate the states' immunity, *id.* at 66, 72–73, 116 S.Ct. 1114, the second *Seminole Tribe* requirement necessitates that we determine whether Congress had the authority pursuant to Section 5 of the Fourteenth Amendment to abrogate the states' sovereign immunity in ADEA actions.

## B. Intent to Abrogate

We must first decide whether Congress made its intent to abrogate the states' immunity "unmistakably clear," *Seminole Tribe*, 517 U.S. at 56, 116 S.Ct. 1114 (quotation and citation omitted), when it enacted the 1974 amendments to the ADEA, which extended the ADEA's applicability to the states. *See* Fair Labor Standards Act Amendments of 1974, § 28, 88 Stat. 74. The University argues that, as the district court found, the language of the ADEA does not make Congress's intent to abrogate the states' immunity unmistakably clear, as required by the Supreme Court. The University contends that the ADEA's definition of "employer," which includes states and thus makes it possible for states to be liable as employers of ADEA plaintiffs, falls short of evincing an unmistakably clear intent to abrogate the states' immunity. The University points out that the Court has required that a statement of Congress's intent must be made with "perfect confidence." *Dellmuth v. Muth*, 491 U.S. 223, 231, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989). It contends that the simple expansion of the definitions of "employer" and "employee" in the statute is insufficient to establish congressional intent to abrogate the states' immunity.

The Faculty Members argue that the statute's definition of "employer" sufficiently indicates Congress's intent to abrogate the states' immunity because that definition expressly includes the states. In their view, states are not immune from ADEA liability because they are specifically listed in the statute as parties subject to liability.

We agree with the reasoning of the Faculty Members. Congress's decision to make states liable under the ADEA is an unmistakable statement that states are *not* immune from ADEA suits. The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). When Congress enacted the ADEA in 1967, the statute applied only to private employers. *See EEOC v. Elrod*, 674 F.2d 601, 605–06 (7th Cir.1982). In 1974, Congress amended the statute so that it also applied to the states by expanding the definition of "employer" to encompass "a State or political subdivision of a State and any agency or instrumentality of a State," Fair Labor Standards Act Amendments of 1974, § 28(a)(2), 88 Stat. 74 (amending 29 U.S.C. § 630(b)(2)), and by amending the term "employee" to include "employees subject to the civil service laws of a State government," *id.* § 28(a)(4) (amending 29 U.S.C. § 630(f)). When Congress added the states to the definition of "employer," it did so knowing that the ADEA provides that an employer who violates the statute is liable for legal and equitable relief. *See* 29 U.S.C. § 626(b), (c).

In reaching our conclusion, we take guidance from the Supreme Court's treatment of this issue in the context of other statutory schemes. In *Seminole Tribe*, the Supreme Court regarded the vesting of jurisdiction in the federal courts for causes of action arising from a state's failure to negotiate with an Indian tribe, *see* 25 U.S.C. § 2710(d)(7)(a)(i), as sufficiently indicative of Congress's intent to abrogate the states' immunity against suit in the federal courts.

Congress has in § 2710(d)(7) provided an unmistakably clear statement of its intent to abrogate. Section 2710(d)(7)(A)(i) vests jurisdiction in the United States district courts over any cause of action arising from the failure of a State to enter into

negotiations in good faith. Any conceivable doubt as to the identity of the defendant in an action under § 2710(d)(7)(A)(i) is dispelled when one looks to the various provisions of § 2710(d)(7)(B), which describe the remedial scheme available to a tribe who files suit.... In sum, we think that the numerous references to the "State" in the text *make it indubitable* that Congress intended through the Act to abrogate the States' sovereign immunity from suit.

*Seminole Tribe*, 517 U.S. at 57, 116 S.Ct. 1114 (quotations, ellipses and brackets omitted, emphasis added). In *Pennsylvania v. Union Gas Co.*, the Supreme Court held that Congress unequivocally waived the states' immunity under CERCLA.[4] 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), *overruled on other grounds, Seminole Tribe*, 517 U.S. at 65, 116 S.Ct. 1114. The Court pointed to the fact that under CERCLA's liability scheme, "persons" who own or operate hazardous waste facilities or who transport or dispose of hazardous waste are liable for removal and remediation costs, *see* 42 U.S.C. § 9607(a), and that CERCLA defines "persons" to include states. *See Union Gas*, 491 U.S. at 8, 109 S.Ct. 2273. In addition, the Court noted that CERCLA provides that in almost all circumstances, states are to be treated in the same manner as non-governmental owner-operators. *See* 42 U.S.C. § 9601(2)(D).

We hold that Congress made its intent to abrogate the states' immunity against ADEA suits eminently clear. "Unless Congress had said in so many words that it was abrogating the states' sovereign immunity in age discrimination cases—and that degree of explicitness is not required ...—it could not have made its desire to override the states' sovereign immunity clearer." *Davidson v. Board of Governors of State Colleges and Univs.*, 920 F.2d 441, 443 (7th Cir.1990) (citations omitted); *see also Hurd v. Pittsburg State Univ.*, 109 F.3d 1540, 1544 (10th Cir.1997) (reaffirming its holding that Congress abrogated the states' Eleventh Amendment immunity in enacting the ADEA's 1974 amend-

ments); *Ramirez v. Puerto Rico Fire Serv.*, 715 F.2d 694, 701 (1st Cir.1983) ("[T]he ADEA's express authorization for the maintenance of suits against state employers comprises adequate evidence to demonstrate the congressional will that Eleventh Amendment immunity be abrogated.").

In reaching this conclusion, we join other appellate courts which have addressed this issue since the *Seminole Tribe* decision and have also determined that the definitional and enforcement provisions of the ADEA contain the necessary clear statement of Congress's intent to abrogate state sovereign immunity. *See Scott v. University of Mississippi*, 148 F.3d 493 (5th Cir.1998); *Keeton v. University of Nevada Sys.*, 150 F.3d 1055 (9th Cir.1998); *Goshtasby v. Board of Trustees*, 141 F.3d 761, 765–66 (7th Cir.1998); *Hurd*, 109 F.3d at 1544. *But see Kimel v. State of Florida Bd. of Regents*, 139 F.3d 1426, 1432 (11th Cir.1998) (holding that ADEA lacks unequivocal expression of an intent to abrogate states' immunity, but reaching such conclusion after limiting consideration to only the actual language of the statute itself).

## C. Power to Abrogate

Having determined that Congress intended to abrogate the states' Eleventh Amendment immunity in extending ADEA coverage to the states, we must now determine whether Congress enacted the ADEA amendments pursuant to a valid exercise of its enforcement authority under Section 5 of the Fourteenth Amendment. *See Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. 1114. The University argues that: (1) Congress did not *intentionally* enact the 1974 amendments to the ADEA pursuant to its enforcement power under Section 5 of the Fourteenth Amendment; and, even if Congress had intentionally done so, (2) the 1974 amendments to the ADEA were not a valid exercise of that power.

### 1.

In making its first argument, the University asserts that *Seminole Tribe* changed the

---

**4.** The Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and

Reauthorization Act of 1986 ("SARA"), Pub.L. 99–499, 100 Stat. 1613.

analysis by which we determine the constitutional authority for the enactment of a statute. According to the University, after *Seminole Tribe*, the appropriate question is whether Congress *in fact* enacted a statute pursuant to its Section 5 power, not whether Congress *could have* enacted the statute pursuant to its Section 5 power. The University thus argues that the 1974 amendments to the ADEA were in fact enacted pursuant to the Commerce Clause and not Section 5 of the Fourteenth Amendment because the legislative history of the ADEA amendments refers to the Commerce Clause.

### a.

■ We disagree with the University's position that *Seminole Tribe* altered the analysis we use to determine a statute's constitutional authority. Even after *Seminole Tribe*, the question we must answer is whether Congress actually possessed the authority to adopt the legislation, not whether Congress correctly articulated the source of that authority. *See Franks v. Kentucky Sch. for the Deaf*, 142 F.3d 360, 363 (6th Cir.1998). As we stated in *Timmer*, "*Seminole Tribe* says nothing about the situation presented here where there is a question about whether Congress legislated pursuant to an unstated Constitutional provision." 104 F.3d at 841–42. As long as Congress possesses the authority, whether it also has the specific intent to legislate pursuant to that authority is irrelevant. *Doe v. University of Illinois*, 138 F.3d 653, 658–59 (7th Cir.1998) (considering Eleventh Amendment immunity issue with regard to ADA); *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir.1997) (considering Eleventh Amendment immunity in relation to Title IX); *Wilson–Jones v. Caviness*, 99 F.3d 203, 208 (6th Cir.1996) (stating that "[a] source of power has been held to justify an act of Congress even if Congress did not state that it rested the act on that particular source of power"). "It is not necessary for Congress to expressly rely on § 5 in exercising its power because such power clearly existed.... [W]e are concerned with the actual powers of the national government." *Marshall v. Owensboro–Daviess County Hosp.*, 581 F.2d 116, 120 (6th Cir.1978) (citation and quotation omitted); *see also Usery*

*v. Charleston County Sch. Dist.*, 558 F.2d 1169, 1171 (4th Cir.1977) ("Our duty in passing on the constitutionality of legislation is to determine whether Congress had the authority to adopt legislation, not whether it correctly guessed the source of that power.").

Other circuits which have addressed the argument presented by the University have uniformly concluded that *Seminole Tribe* did not change the standard for determining whether legislation was enacted pursuant to Congress's Section 5 power. *See, e.g., Goshtasby*, 141 F.3d at 768; *CSX Transp., Inc. v. Board of Public Works of W. Va.*, 138 F.3d 537, 539–40 (4th Cir.1998); *Doe*, 138 F.3d at 659–61; *Sacred Heart Hosp. v. Pennsylvania (In re Sacred Heart Hosp.)*, 133 F.3d 237, 244 (3d Cir.1998); *Clark v. California*, 123 F.3d 1267, 1271 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *Mills v. Maine*, 118 F.3d 37, 43 (1st Cir.1997); *Hurd*, 109 F.3d at 1545; *Crawford*, 109 F.3d at 1283. We join the conclusion of our sister circuits and hold that *Seminole Tribe* did not alter the analysis by which we determine the constitutional authority for the enactment of a statute. We now turn to the issue of whether Section 5 of the Fourteenth Amendment provided Congress with the authority to enact the 1974 amendments to the ADEA.

### b.

■ Section 1 of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws," while Section 5 grants Congress the enforcement power to effectuate the goals of the amendment.

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce the submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Ex parte Virginia*, 100 U.S. 339, 345–46, 25 L.Ed. 676 (1879). A statute is "appropriate

legislation" under Section 5 of the Fourteenth Amendment if the enactment is "'plainly adapted'" to enforcing the Equal Protection Clause and "not prohibited by but is consistent with 'the letter and spirit of the [C]onstitution.'" *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (quoting *McCulloch v. Maryland,* 17 U.S. (4 Wheat) 316, 421, 4 L.Ed. 579 (1819)).

Congress did not expressly cite Section 5 of the Fourteenth Amendment in its enactment of the 1974 amendments to the ADEA. However, in originally enacting the ADEA, Congress detailed the problems that it hoped the statute would address. In this regard, Congress made the following findings:

(1) in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;

(2) the *setting of arbitrary age limits regardless of potential for job performance* has become common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;

(3) the incidence of unemployment, especially long-term employment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;

(4) the existence in industries affecting commerce, *of arbitrary discrimination in employment because of age,* burdens commerce and the free flow of goods in commerce.

29 U.S.C. § 621(a) (emphasis added). After "extensive factfinding undertaken by the Executive Branch and Congress" of age discrimination in employment, *EEOC v. Wyoming,* 460 U.S. 226, 230–31, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), Congress concluded that "older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Although Congress expressly invoked the Commerce Clause in the introductory statement to the House Report on the 1974 amendments to the ADEA,

see H. Rep. No. 93–313, *reprinted in* 1974 U.S.C.C.A.N. 2811, 1974 WL 11448, at *3, the portion of the report discussing the amendments focuses on the need to remedy the problem of age discrimination, not on the impact of that discrimination on commerce. *See id.* at *84–*85. This emphasis on the injustice of discrimination based on age indicates that the 1974 amendments were remedial legislation enacted under Congress's Section 5 power. *See, e.g., Ramirez v. Puerto Rico Fire Serv.,* 715 F.2d 694, 699–700 (1st Cir.1983); *Elrod,* 674 F.2d at 604, 605 (concluding that Congress's objective in the 1974 amendments "was to prohibit arbitrary discriminatory government conduct that is the very essence of the guarantee of equal protection of the laws of the Fourteenth Amendment"). Based on the apparently remedial nature of the statute, we agree that Congress enacted the legislation pursuant to the Commerce Clause *and* the Fourteenth Amendment.

The fact that Congress did not expressly invoke the authority of Section 5 of the Fourteenth Amendment when it enacted the amendments to the ADEA is not fatal. *Wyoming,* 460 U.S. at 243–44 n. 18, 103 S.Ct. 1054; *Franks,* 142 F.3d at 363 (holding Title IX, which lacks any explicit language regarding the Fourteenth Amendment, to be a valid exercise of Congress's Fourteenth Amendment enforcement power); *Timmer,* 104 F.3d at 839 (holding that Equal Pay Act, which lacks an express statement of the constitutional basis of the extension of the Fair Labor Standards Act to the states, authorized by Section 5 of Fourteenth Amendment).

■■■ Accordingly, we reject the University's contention that Congress did not in fact enact the 1974 amendments to the ADEA pursuant to its Section 5 power. "The ... constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596 (1948). "Although a court must be able to discern support for the exercise of § 5 power '[t]hat does not mean ... that Congress need anywhere recite the words section 5 or Fourteenth Amendment

or equal protection.'" *Timmer,* 104 F.3d at 840 (quoting *Wyoming,* 460 U.S. at 243, 103 S.Ct. 1054). When Congress extended the application of the ADEA to the states in 1974, it clearly intended to prohibit the states from arbitrarily discriminating on the basis of age in the employment setting, and the Fourteenth Amendment empowered Congress to do so. *See Elrod,* 674 F.2d at 604 (stating that "it is clear that the purpose of the [1974 amendment] was to prohibit arbitrary, discriminatory government conduct that is the very essence of the guarantee of 'equal protection of the laws' of the Fourteenth Amendment."). We see no reason to frustrate that intent simply because the ADEA's legislative history does not contain the words "Section 5 of the Fourteenth Amendment."

### 2.

#### a.

■ The University argues in the alternative that even if Congress intended to legislate under its Section 5 authority, such an exercise of that power was invalid. It contends that the ADEA exceeds Congress's Section 5 enforcement authority because age is not a suspect or quasi-suspect class, and judicial review of a law involving an age classification is only subject to rational review. According to the University's reasoning, the Fourteenth Amendment cannot be the source of authority for federal legislation prohibiting employers from age-based discrimination because such discrimination does not implicate the Equal Protection Clause.

■ We disagree. The Supreme Court's equal protection jurisprudence is not confined to suspect or quasi-suspect classifications. *See Scott,* 148 F.3d at 500–01; *Mills,* 118 F.3d at 46. In addition, the Supreme Court has indicated that the Equal Protection Clause reaches age discrimination. *See Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) (applying equal protection analysis to a class based on age); *Mas-*

sachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) *(per curiam* ) (same); *see also Scott,* 148 F.3d at 500–01; *Goshtasby,* 141 F.3d at 770–71 (regarding the Supreme Court's entertainment of equal protection claims based on age classification as affirming the extension of the Equal Protection Clause to classes drawn by age).

■ Moreover, "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure *every person* within the state's jurisdiction against intentional and arbitrary discrimination." *Sunday Lake Iron Co. v. Wakefield Township,* 247 U.S. 350, 352, 38 S.Ct. 495, 62 L.Ed. 1154 (1918) (emphasis added); *see also City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (emphasizing that the Equal Protection Clause's general requirement is that all persons similarly situated are treated alike). Thus, the fact that age is not a suspect classification does not eliminate the Equal Protection Clause as a source authorizing Congress to prohibit age-based discrimination; accordingly, Congress did not exceed the scope of its Section 5 authority in enacting the 1974 amendments to the ADEA.

#### b.

■ The University also invokes the Supreme Court's decision in *City of Boerne* to argue that the scope of the ADEA is so expansive that it is substantive rather than remedial in nature and, thus, is not a valid exercise of Congress's Section 5 enforcement power. *See* —— U.S. ——, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997).[5]

In *City of Boerne,* the Court held that RFRA was an unconstitutional exercise of Congress's Section 5 power because it was "so out of proportion" to the problems identified by RFRA that the statute could not be regarded as enforcing the provisions of the Fourteenth Amendment. *Id.* 117 S.Ct. at 2170. The Court arrived at its conclusion

---

5. In *City of Boerne,* the Supreme Court considered the constitutionality of the Religious Freedom and Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.* Congress enacted RFRA in response to the Supreme Court's decision in *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the Court held that the Free Exercise Clause does not require states to make exceptions to neutral and general-

ly applicable laws even when such laws significantly burden religious practices. *See id.* at 887, 110 S.Ct. 1595. Through RFRA, Congress attempted to circumvent *Smith* legislatively by imposing a requirement that laws which substantially burden a person's exercise of religion must be justified as furthering a compelling state interest and as the least restrictive means of doing so. *See* 42 U.S.C. § 2000bb–1.

after making three determinations. The Court determined first that there was not a "pattern or practice of unconstitutional conduct under the Free Exercise Clause as interpreted in *Smith.*" *Id.* at 2171. Second, it found that RFRA imposed "the most demanding test known to constitutional law." *Id.* In the Court's view, this standard created a likelihood of invalidating many state laws. *See id.* Third, the Court found that RFRA "contradicts vital principles necessary to maintain separation of powers and the federal balance" because it was such a sweeping response by Congress that it could be interpreted as an attempt to expand the substantive meaning of the Fourteenth Amendment rather than being remedial in nature. *See id.* at 2172.

■■■■■ Through its analysis in *City of Boerne,* the Supreme Court provided us with additional guidance to that supplied by *Seminole Tribe* for determining whether a statute is appropriate legislation under Congress's Section 5 enforcement power. Legislation which deters or remedies constitutional violations falls within "the sweep of Congress' enforcement power." *Id.* 117 S.Ct. at 2163. However, "Congress does not enforce a constitutional right by changing what the right is. It has been given the power to enforce, not the power to determine what constitutes a constitutional violation." *Id.* at 2164.

In order for a statute to be remedial under *City of Boerne,* and thereby within Congress's enforcement power, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect." *Id.* at 2164. In making a proportionality inquiry, the *City of Boerne* Court instructed that "[t]he appropriateness of remedial measures must be considered in light of the evil presented." *Id.* at 2169 (citation omitted). The Fifth Circuit has restated the Court's holding in the form of a workable inquiry: "This proportionality inquiry has two primary facets: the extent of the threatened constitutional violations, and the scope of the steps provided in the legislation to remedy or pre-

vent such violations." *See Scott,* 148 F.3d at 501–02 (quoting *Coolbaugh v. Louisiana,* 136 F.3d 430, 435 (5th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 58, —— L.Ed.2d —— (1998)). We now turn to each of these considerations.

Congress's legislative findings in enacting the ADEA, recited previously in this opinion, are helpful in determining the extent of the threatened constitutional violations. In enacting the ADEA, Congress detailed the "evil" that Congress was addressing: that "older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." *Hazen Paper Co.,* 507 U.S. at 610, 113 S.Ct. 1701. As mentioned, the evidence before Congress established that qualified workers were being fired, not hired, and paid less because of their age. The evidence also indicated that employers used age as an arbitrary proxy for ability. *See Wyoming,* 460 U.S. at 231, 103 S.Ct. 1054. Congress later established that these same conditions existed in the public sector. *See* S.Rep. No. 846, 93d Cong., 2d Sess. 112 (1974); Senate Special Comm. on Aging, Improving the Age Discrimination Law, 93d Cong., 1st Sess. 14 (Comm. Print 1973); *Elrod,* 674 F.2d at 605 ("The passage of [the amendments to the ADEA] insures that Government employees will be subject to the same protections against arbitrary employment [discrimination] based on age as are employees in the private sector." (quoting remarks of Sen. Bentsen, 120 Cong. Rec. 8768 (1974))). Finally, both the House and Senate cited President Nixon's remarks in 1972 to indicate the congressional purpose of the 1974 amendment:

Discrimination based on age—what some people call "age-ism"—can be as great an evil in our society as discrimination based on race or religion or any other characteristic which ignores a person's unique status as an individual and treats him or her as a member of some arbitrarily-defined group. Especially in the employment field, discrimination based on age is cruel and self-defeating; it destroys the spirit of those who want to work and it denies the Nation[ ] the contribution they could make if they were working.

*Elrod,* 674 F.2d at 605 (quoting S.Rep. No. 93–690, 93d Cong., 2d Sess. 55 (1974), and H.R.Rep. No. 93–313, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.S.C.A.N. 2811, 2849). Thus, Congress concluded that the practice of using age classifications in employment, in both the private and public sector, violated the Constitution because such classifications are arbitrary and discriminatory.

Pursuant to *City of Boerne,* we must also determine whether the scope of the ADEA is so sweeping that the statute is disproportionate to the "evil" Congress sought to eradicate. *See Scott,* 148 F.3d at 501–02 (citing *Coolbaugh,* 136 F.3d at 437–38). The purpose of the ADEA is "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). The ADEA attempts to prevent discrimination against older Americans by requiring that employer determinations be based on merit. *See Hazen Paper,* 507 U.S. at 611, 113 S.Ct. 1701 ("The employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly."). Thus, the ADEA requires case-by-case determinations based on facts. *Id.; Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 422–23, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985).

Although the ADEA may prohibit some conduct not prohibited by the Constitution, "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress's enforcement power even if in the process it prohibits conduct which is itself not unconstitutional." *City of Boerne,* 117 S.Ct. at 2163. The *City of Boerne* Court explained that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies." *Id.* at 2164. Thus, even after the *City of Boerne,* the fact that some ADEA provisions may exceed constitutional requirements does not render the statute so disproportionate to its purpose that it represents an invalid exercise of Congress's enforcement power. *See Scott,* 148 F.3d at 503–04; *Goshtasby,* 141 F.3d at 772.

Accordingly, we conclude that the amendments to the ADEA do not create substantive rights but, instead, are remedial in nature because the scope of the legislation is not disproportionate to the scope of the threatened constitutional violations. *See Scott,* 148 F.3d at 503–04; *Goshtasby,* 141 F.3d at 772 (stating that "unlike the statute at issue in *City of Boerne,* which imposed 'the most demanding test known to constitutional law,' the ADEA is narrowly drawn to protect older citizens from arbitrary and capricious action by the state" (citations omitted)).

### IV.

We hold that Congress intended to abrogate the states' Eleventh Amendment immunity from suit by its enactment of the 1974 amendments to the ADEA, and that it had the authority to do so pursuant to Section 5 of the Fourteenth Amendment. We therefore **REVERSE** and **REMAND** this cause to the district court for further proceedings in accordance with this opinion.