Easton BECKFORD, Plaintiff,

v.

Frank IRVIN, Stephen Kruppner, Donald R. Wolff and the State of New York, Defendants.

No. 96–CV–273H.

United States District Court, W.D. New York.

April 13, 1999.

Easton Beckford, Comstock, NY, Anna Marie Richmond, Robbie Lee Billingsley, Buffalo, NY, for plaintiff.

Jerry McGrier, Sr., Attorney General's Office, Buffalo, NY, for defendants.

## DECISION & ORDER

HECKMAN, United States Magistrate Judge.

Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct all proceedings in this case, including the entry of final judgment (Item 32). A jury trial was held beginning on November 9, 1998, and a verdict was rendered in favor of the plaintiff on November 18, 1998 (*See* Item 82). Plaintiff was awarded $15,000 in punitive damages from defendant Irvin, $10,000 in punitive damages from defendant Kruppner, and $125,000 in compensatory damages from the State of New York. Pursuant to Rules 12(b)(1), 50(b), 50(c), 59(a), and 59(e), of the Federal Rules of Civil Procedure, defendants move to dismiss plaintiff's Americans with Disabilities Act ("ADA") claim, and to set aside the jury verdict (Item 83).

For the reasons set forth below, defendants' motion is denied. I find that Congress enacted the Americans with Disabilities Act pursuant to a valid exercise of authority under section five of the Fourteenth Amendment. I also find that plaintiff established an Eighth Amendment claim against defendants Irvin and Kruppner, and is entitled to an award of punitive damages. Furthermore, plaintiff will be awarded nominal damages in the amount of $1.00 from both defendant Irvin and defendant Kruppner. Finally, defendants' motion for a new trial and defendants' motion for remittitur is denied.

## BACKGROUND

Plaintiff Easton Beckford, an inmate in the custody of the New York State Department of Correctional Services, brought this action pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment right against cruel and unusual punishment, and violations of his rights under the Americans with Disabilities Act and section 504 of the Federal Rehabilitation Act (Item 40). Plaintiff has been confined to a wheelchair since 1984. All events at issue at trial took place between January 1994 and May 1995, while plaintiff was confined at the Wende Correctional Facility ("Wende").

On January 13, 1994, plaintiff was transferred from the Central New York Psychiatric Center to Wende, and was placed in Wende's Mental Health Observation Unit ("MHU"). Plaintiff was transferred to Wende because it is one of only three facilities with wheelchair accessible medical units. He was not placed in MHU for mental health treatment. He was placed in MHU because the cell was bigger and because his wheelchair fit in the cell. However, as the record demonstrates, once plaintiff arrived at Wende, one of the first things prison officials did was to take away his wheelchair. Within his first month at Wende, plaintiff exhibited behavior that plaintiff's counsel characterized as "peculiar," and "anti-[plaintiff]." For example, on January 31, plaintiff covered his body with feces. On February 2, after being denied his one hour of recreation, plaintiff stabbed himself with a plastic fork.

On February 2, 1994, plaintiff was moved to the Special Housing Unit ("SHU") and remained there until March 7, 1994. Plaintiff did not have access to his wheelchair while housed in SHU. When it was time for plaintiff to shower, plaintiff's cell door was opened so that he could go and use the shower. However, plaintiff was unable to go to the shower without using his wheelchair. According to plaintiff, prison officials designated this as a

refusal by plaintiff to take a shower. Plaintiff went without a shower for the entire thirty-two days he was housed in SHU. When it was time for plaintiff's one hour of recreation, plaintiff's cell door was opened so that he could take his recreation. However, plaintiff was unable to leave his cell without the use of his wheelchair. According to plaintiff, prison officials said that plaintiff refused recreation because he did not leave his cell.

Plaintiff was unable to file any grievances while in SHU because he lacked a pencil and paper. Plaintiff said this was because he had not yet received his property after being transferred. However, another SHU inmate, Abdallah Davis, filed grievances on plaintiff's behalf. When Deputy Murray responded to one of those grievances, he indicated that his review of plaintiff's records failed to show the need for a cane or a wheelchair. In addition, Defendant Kruppner, Deputy Superintendent for Administration at Wende, read from a note in plaintiff's mental health records in which the author indicated that plaintiff had not showered in thirty-three days. Corrections officers who responded to a query from the note's author said that the showers in SHU are not wheelchair accessible.

There was some conflicting evidence as to plaintiff's bedsores. A nurse observed plaintiff's bedsores on both February 24 and February 28, 1994. Both times the nurse described the sores as a discoloration. Plaintiff was told that he would need to put in a sick call slip if he wanted to receive treatment for his sores. On March 3, 1994, after filing a March 1, 1994, grievance, plaintiff was seen by a doctor. Because plaintiff had seen a physician, his grievance was denied.

Joseph Gerken, an attorney formerly employed with Prisoners' Legal Services ("PLS") in Buffalo, New York, testified about visiting plaintiff at Wende on February 24, 1994, and observing plaintiff's bedsores. Mr. Gerken made this visit in response to a letter from plaintiff complaining about bedsores. While not a health professional, Mr. Gerken testified as to his previous work experience as an orderly, and his familiarity with seeing bedsores on patients he worked with. He testified that he saw open and oozing sores on plaintiff's body. While leaving the facility, Mr. Gerken testified that he informed defendant Wolff, Deputy Superintendent for Security at Wende, about his observations, and followed this up with a letter to defendant Irvin.

On March 7, 1994, plaintiff was transferred to Great Meadow Correctional Facility. When he returned to Wende, plaintiff was sent directly to MHU. Plaintiff was allowed to use a wheelchair upon his return from Great Meadow. Plaintiff was also sent to several medical specialists who recommended that plaintiff receive physical therapy. One physical therapist suggested that plaintiff would probably be able to walk if he was fitted with a leg brace and assistive devices. Plaintiff was not given physical therapy or a leg brace.

Defendant Irvin testified that Amnesty International took an interest in plaintiff's condition, and that letters were received from as far away as Switzerland and Australia. However, defendants' exhibit 23 showed that defendant Irvin informed officials in Albany that plaintiff was observed walking and that he has been taking showers regularly. At trial, defendants did not offer any testimony about plaintiff walking in his cell.

In June 1994, plaintiff was transferred to Shawangunk Correctional Facility. In Shawangunk, plaintiff was placed in a wheelchair-accessible SHU. Plaintiff was returned to Wende in September 1994 so that he could obtain medical treatment at the Erie County Medical Center. Once again, plaintiff was housed in the MHU. Plaintiff was returned to Shawangunk on October 5, 1994. On October 30, 1994, plaintiff was sent back to Wende, and was once again housed in the MHU. Plaintiff's medical record showed that he was taking

Dilantin and Phenobarbital for his seizures. He was also taking Naproxen, Mellaril, Elavil, and Prozac. However, when plaintiff was returned to Wende he was not provided with all of his medications. Plaintiff was only given Dilantin, Phenobarbital, and Naproxen.

Dr. Capote, an employee at Wende, testified about evaluating plaintiff's psychiatric condition. While Dr. Capote found plaintiff to be competent, he testified that he never really looked at plaintiff's medical records and that he really did not know much about plaintiff. Plaintiff was not Dr. Capote's patient.

On November 14, 1994, plaintiff was committed to the custody of James Stone, Commissioner of Mental Hygiene, by Duchess County Court Judge George D. Marlow. Plaintiff received a copy of the commitment order from Dr. Green, head of Wende's MHU. Commissioner Stone never took custody of plaintiff. Plaintiff's medical record indicates that his mental health started to deteriorate around this time. Plaintiff threatened staff and threatened to throw feces. On December 17, plaintiff followed through with his threat and threw feces from his cell. Prison officials removed plaintiff's wheelchair as punishment and erected a plexiglass shield in front of his cell. Plaintiff did not begin receiving all of his medications until early January, 1995.

Plaintiff also complained about the difficulty he had bathing and getting a drink of water while in his cell. Both sides agreed that the toilet and sink are attached, and that the drinking fountain is on top of the sink. Because of his wheelchair, plaintiff was unable to reach the sink or fountain in his cell unless he used a cup. However, plaintiff was not allowed to keep a cup in his cell because it violated prison rules. He was occasionally denied meals for keeping a cup from his meal tray in his cell. Plaintiff testified that when he did have use of a cup, he would use it to draw water from his toilet in an effort to bathe and cleanse his bedsores.

The jury also watched a videotape of plaintiff being extracted from his cell on April 12, 1995, in an effort to remove his wheelchair. Prior to the cell extraction, another MHU inmate, Leon Wright, set a fire in his cell. Plaintiff banged on his cell bars with part of the wheelchair, complaining that smoke obstructed his breathing and requested to be removed from the cell. According to Lieutenant Cooks, plaintiff was asked to give up his wheelchair because he was banging it against the cell doors. Dr. Capote testified that during this incident he went to talk to plaintiff because he heard plaintiff had suicidal ideation. According to Dr. Capote, there was no mention of the wheelchair in his conversation with plaintiff. Shortly after meeting with Dr. Capote, correctional officers entered plaintiff's cell, removed plaintiff's wheelchair, removed plaintiff from his cell, placed shackles on his hands and feet, and forcibly moved plaintiff to a shower (*See* Pl.Ex. 9). Plaintiff was left lying face down and shackled on a shower floor, with the water intermittently being turned on and off, for approximately twenty minutes.

## PROCEDURAL HISTORY

Plaintiff commenced this action by filing a pro se complaint on April 23, 1996 (Item 1). On May 24, 1996, plaintiff moved for appointment of counsel (Item 4). Plaintiff's motion was granted, and counsel was appointed on January 14, 1997 (Item 31). With the court's approval, an amended complaint was filed on September 5, 1997 (Item 40).

Plaintiff set forth eight causes of action in his amended complaint. Prior to trial, the parties stipulated to the discontinuance of claims against several parties (Item 74). The fourth cause of action was dismissed on November 12. On November 13, the seventh cause of action was dismissed, and the eighth cause of action was dismissed against all defendants except the State of New York. The remaining defendants were the State of New York, Superintendent

Frank Irvin, Steven Kruppner, Deputy Superintendent for Administration, and Donald R. Wolff, Deputy Superintendent for Security.

Two claims were ultimately presented to the jury. First, plaintiff complained that defendants Irvin, Wolff and Kruppner were deliberately indifferent to plaintiff's serious medical needs, in violation of his Eighth Amendment right to be free from cruel and unusual punishment, by failing to train and supervise their subordinates, and by failing to respond adequately to plaintiff's complaints. Second, plaintiff complained that defendant State of New York violated plaintiff's rights under the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*, by denying him access to programs and services available to non-disabled inmates, by subjecting him to discrimination by virtue of his disability, by failing to provide him with his wheelchair for sustained periods of time, and by failing to provide him with a wheelchair accessible environment.

The trial took place from November 9, 1998, through November 18, 1998. On November 18, 1998, the jury returned a verdict in the amount $150,000 for the plaintiff (*See* Item 77, 80). The jury found an Eighth Amendment violation against defendants Irvin and Kruppner, but not against defendant Donald Wolff (Item 77, at 1). Without awarding compensatory or nominal damages, the jury awarded plaintiff punitive damages against defendant Irvin in the amount of $15,000, and $10,000 in punitive damages against defendant Kruppner (Item 77, at 3–4). On the ADA claim, the jury awarded plaintiff $125,000 in compensatory damages against the State of New York (Item 77, at 4–5).

Judgement was entered in favor of the plaintiff on November 30, 1998 (Item 82). On December 9, 1998, defendants filed a motion seeking the following relief: (1) dismissal of the Americans with Disabilities Act (ADA) claim for lack of subject matter jurisdiction; (2) granting judgment as a matter of law on the ground that there is insufficient proof to support the jury's findings; (3) setting aside the jury verdict rendered against the defendants in the amount of $0.00 in compensatory damages, $0.00 in nominal damages, and (cumulatively) $25,000 in punitive damages against defendants Irvin and Kruppner; (4) setting aside the jury verdict against defendant State of New York; and, (5) in the alternative, granting remittitur relative to the amount of damages found by the jury (Item 83).

## DISCUSSION

### I. Sovereign Immunity and the Americans With Disabilities Act.

Defendants argue that the ADA does not abrogate a state's sovereign immunity because it was not enacted pursuant to a valid exercise of congressional authority under section five of the Fourteenth Amendment (Item 84, at 3). In support of this argument, defendants recognize that Congress possessed the power to enact the ADA, but argue that it lacked the authority to abrogate a state's sovereign immunity under the Eleventh Amendment (Item 84, at 8).

The ADA, "[l]ike the other antidiscrimination statutes, ... is an exercise of Congress' power under section 5 of the Fourteenth Amendment." *Crawford v. Indiana Dept. of Corrections,* 115 F.3d 481, 487 (7th Cir.1997); *Muller v. Costello,* 997 F.Supp. 299, 304 (N.D.N.Y.1998); *see also Cooper v. New York State Office of Mental Health,* 162 F.3d 770, 777 (2d Cir. 1998) (holding ADEA enacted pursuant to section five of the Fourteenth Amendment), *petition for cert. filed,* 67 USLW 3614 (1999).

A two-part test is used to determine whether Congress effectively abrogated the States' sovereign immunity under the Eleventh Amendment. First, it is necessary to determine "whether Congress has unequivocally expressed its intent to abrogate the immunity." *Seminole Tribe*

*of Florida v. Florida*, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)) (internal punctuation omitted). Second, it is necessary to determine "whether Congress has acted pursuant to a valid exercise of power." *Id.*

"Congress' intent to abrogate the State's immunity from suit must come from a clear legislative statement." *Id.* (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 786, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)) (internal punctuation omitted). Congress clearly intended to abrogate state sovereign immunity under the ADA. *See* 42 U.S.C. § 12202; *Kimel v. State Bd. of Regents*, 139 F.3d 1426, 1433 (11th Cir.1998), *cert. granted*, —— U.S. ——, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999); *Coolbaugh v. State of Louisiana*, 136 F.3d 430, 433 (5th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998); *Clark v.. State of California*, 123 F.3d 1267, 1269 (9th Cir.1997); *cert. denied by, Wilson v. Armstrong*, —— U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *Crawford*, 115 F.3d at 487; *see also Galusha v. New York State Dep't of Env. Cons.*, 27 F.Supp.2d 117, 124 (N.D.N.Y.1998); *Muller*, 997 F.Supp. at 304. As stated in the legislative history, the purpose of the ADA is, in part, "to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life." H.R.REP. No. 101–485(ll), at 22 (1990); *reprinted in* 1990 U.S.C.C.A.N. 303, 304; *see* 42 U.S.C. § 12101. In passing the Act, Congress was interested in "eliminating a form of discrimination that [was] considered unfair and even odious." *Crawford*, 115 F.3d at 486; *Coolbaugh*, 136 F.3d at 438; *Clark*, 123 F.3d at 1270.

Defendants correctly point out that a physical or mental disability is not a suspect classification. *Suffolk Parents of Handicapped Adults v. Wingate*, 101 F.3d 818, 824 n. 4 (2d Cir.1996), *cert. denied*, 520 U.S. 1239, 117 S.Ct. 1843, 137 L.Ed.2d 1047 (1997); *Disabled American Veterans v. United States Dep't of Veterans Affairs*, 962 F.2d 136, 141 (2d Cir.1992). This raises the question of whether abrogation occurred pursuant to a valid exercise of Congressional power. *See Seminole Tribe of Florida*, 517 U.S. at 55, 116 S.Ct. 1114. Congress is empowered to enact legislation protecting against discrimination through the equal protection clause. *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Clark*, 123 F.3d at 1270; *See Goshtasby v. Board of Trustees*, 141 F.3d 761, 770 (7th Cir.1998); *Cooper*, 162 F.3d at 777 (holding that "Congress has the power to prohibit arbitrary age-based discrimination even though age is not a suspect classification and no fundamental right is involved."). As the Goshtasby panel points out, "[t]he Supreme Court's equal protection jurisprudence is not confined to traditional suspect or quasi-suspect classifications." 141 F.3d at 771 (citing *Mills v. State of Maine*, 118 F.3d 37, 46 (1st Cir.1997)). Simply put, the Equal Protection Clause allows Congress to legislate against intentional and arbitrary discrimination within the state. *Id.* (quoting *Sunday Lake Iron Co. v. Wakefield Township*, 247 U.S. 350, 352, 38 S.Ct. 495, 62 L.Ed. 1154 (1918)).

Defendants disagree with this legal principle (*See* Item 84, at 6–13). Instead, defendants want this court to adopt a minority position, held by several courts, that Congress did not effectively abrogate the States' sovereign immunity when it enacted the ADA. *See Brown v. North Carolina Div. of Motor Vehicles*, 166 F.3d 698 (4th Cir.1999); *Kilcullen v. New York State Dep't. of Transp.*, 33 F.Supp.2d 133 (N.D.N.Y.1999); *Garrett v. Board of Trustees*, 989 F.Supp. 1409 (N.D.Ala.1998); *Nihiser v. Ohio Envtl. Protection Agency*, 979 F.Supp. 1168 (S.D.Ohio 1997).

According to defendants, the Supreme Court's holding in *City of Boerne v. Flores*

prohibited Congress from enacting the ADA because it confers rights far more extensive than those provided by the Fourteenth Amendment. 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In *City of Boerne*, the Court held that Congress has the "power 'to enforce,' not the power to determine what constitutes a constitutional violation." *Id.* at 519, 117 S.Ct. at 2164, 138 L.Ed.2d at 638. This is because section five of the Fourteenth Amendment allows Congress to correct or prevent constitutional violations. *Id.* at 522–23, 117 S.Ct. at 2166, 138 L.Ed.2d at 641–42. The appropriateness of any remedial legislation is to be judged within the context "of the evil presented." *Id.* at 529, 117 S.Ct. at 2169, 138 L.Ed.2d at 645 (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)).

In order to adjudge the appropriateness of the Religious Freedom Restoration Act of 1993 ("RFRA"), the Court in *City of Boerne* compared the types of harm presented to Congress when considering passage of RFRA and the Voting Rights Act of 1965. *Id.* at 529–30, 117 S.Ct. at 2169–70, 138 L.Ed.2d at 645–46. RFRA's legislative record, according to *City of Boerne*, showed no recent examples of religious bigotry occurring in the 40 years prior to the statute's passage. *Id.* at 529, 117 S.Ct. at 2169, 138 L.Ed.2d at 645. Based on this record, the Court concluded that "RFRA cannot be considered remedial, preventative legislation.... RFRA is so out of proportion to a supposed remedial or preventative object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections." *Id.* at 529, 117 S.Ct. at 2169, 138 L.Ed.2d at 646.

In contrast to RFRA, the ADA's legislative history is replete with examples of deliberate, blatant, and even indifferent instances of discrimination against the disabled. *See* H.REP. No. 101–485(LL), at 28–43. There was even recognition by Congress that discrimination against the disabled results from "the construction of transportation, architectural, and communication barriers or the adoption or application of standards, criteria, practices or procedures that are based on thoughtlessness or indifference—that discrimination resulting from benign neglect." *Id.* at 29. Congress is clearly granted the authority to correct such discrimination through the Equal Protection Clause. *City of Boerne*, 521 U.S. at 507, 117 S.Ct. at 2157, 138 L.Ed.2d at 637 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)); *Goshtasby*, 141 F.3d at 770; *Crawford*, 115 F.3d at 487.

Accordingly, defendants' motion to dismiss the ADA claim is denied.

## II. Judgment as a Matter of Law.

Defendants also move for judgment as a matter of law pursuant to Rule 50(b) (*See* Item 84, at 13–15). According to Rule 50:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

FED.R.CIV.P. 50(a)(1). A motion for judgment as a matter of law may be renewed within ten days after an entry of judgment. *Id.* Rule 50(b).

Viewing the evidence in a light most favorable to the nonmoving party, a trial court must deny a motion for judgment as a matter of law unless " 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could

have reached.'" *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154–55 (2d Cir.1994) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)); *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992). Deference must be given to all credible determinations and reasonable inferences of the jury. *Galdieri–Ambrosini v. National Realty and Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998). The verdict will be overturned only if the evidence is such that "reasonable and fair minded persons could only have reached the opposite result." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir.1993) (internal citations omitted); *see also Mahoney v. Canada Dry Bottling Co. of New York*, No. 94–CV–2924(FB), 1998 WL 231082, at * 2 (E.D.N.Y. May 7, 1998).

Defendants' motion for judgment as a matter of law focuses solely on plaintiff's Eighth Amendment claims against defendants Irvin and Kruppner (*See* Item 84, at 13–15). Plaintiff's fifth cause of action alleged that defendants Irvin and Kruppner failed to train and supervise their subordinates who denied plaintiff medical care and subjected plaintiff to inhumane conditions of confinement (Item 40, ¶ 97(a); Item 84, at 13). Plaintiff further alleged that defendants Irvin and Kruppner failed to respond to plaintiff's complaints and stop or prevent the further violation of plaintiff's rights (Item 40, ¶ 97(b)). Defendants contend that punitive damages were improperly awarded because plaintiff failed to establish that they were deliberately indifferent to his serious medical needs (Item 84, at 13).

## A. Deliberate Indifference.

■ Defendants allege that plaintiff failed to meet his burden of proving that they were deliberately indifferent to his serious medical needs. According to defendants, plaintiff relied solely on concluso-

ry statements to support his argument of deliberate indifference, and failed to show how the bedsores constituted serious medical needs (Item 84, at 13). In support of their argument, defendants contend that plaintiff failed to prove the objective component requirement that plaintiff had a serious medical need (Item 84, at 14). *See Wilson v. Seiter*, 501 U.S. 294, 302, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998); *Hathaway v. Coughlin*, 37 F.3d 63, 67–68 (2d Cir.1994).[1]

During trial, plaintiff presented evidence in the form of testimony from himself, former Deputy Superintendent Murray, Nurse Duncon, Anthony Williams, Abdallah Davis, Deputy Superintendent Kruppner, Superintendent Irvin, and Joseph Gerken. Documentary evidence concerning plaintiff's medical care was also presented. Abdallah Davis testified that he would file grievances on behalf of plaintiff, so that plaintiff could receive use of his wheelchair or a walker, and so he could receive treatment for his bedsores. Plaintiff was unable to shower while housed in SHU, and he was not provided any means of cleansing his bedsores. Plaintiff also told the jury that he would use a cup to draw water out of the toilet in an effort to cleanse himself. Joseph Gerken, a former PLS attorney who investigated plaintiff's claim, testified about seeing open and oozing sores on plaintiff's body. He reported this observation to both defendants Wolff and Irvin. However, plaintiff did not receive any treatment until he filed a grievance on March 1, 1994.

The medical records also show that plaintiff was recommended for physical therapy, and it was suggested that plaintiff might be able to walk if he was fitted with a leg brace and assistive devices. Plaintiff never received therapy and he was never fitted with assistive devices. Instead, the

1. The deliberate indifference standard requires a plaintiff to prove that prison officials knew of and disregarded the plaintiff's serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Chance*, 143 F.3d at 703; *Hathaway*, 37 F.3d at 67–68.

record clearly shows that plaintiff was denied use of his wheelchair for extended periods of time.

Plaintiff was also denied many of his medications for varying periods of time. When plaintiff returned to Wende from Shawangunk Correctional Facility on October 30, 1994, he was taking Dilantin, Phenobarbital, Naproxen, Mellaril, Elavil, and Prozac. However, plaintiff was only given Dilantin, Phenobarbital, and Naproxen at Wende. Plaintiff was not given all of his medications until January 1995. The jury heard evidence of plaintiff's mental condition deteriorating during the intervening period.

■■■ Deliberate indifference to a prisoner's serious medical needs "constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* at 106, 97 S.Ct. 285. After hearing the evidence in this case, the jury found that defendants' Irvin and Kruppner were deliberately indifferent to plaintiff's serious medical needs. Based on the evidence presented at trial, there is nothing to suggest that a reasonable person should have reached the opposite result. *See Cruz*, 34 F.3d at 1154–55; *Song*, 957 F.2d at 1046; *Lambert*, 10 F.3d at 56.

Defendants point to *Shakka v. Smith*, 71 F.3d 162 (4th Cir.1995), to support their argument that the objective component is satisfied only if the inmate's medical needs are serious.[2] While defendants correctly point out that *Shakka* addresses the objec-

tive standard of deliberate indifference, the facts in *Shakka* differ from the facts in this case. In *Shakka*, a wheelchair-bound plaintiff alleged that prison officials were deliberately indifferent to his serious medical needs when his wheelchair was removed for a 24 hour period and he was not provided the opportunity to shower for three days after other inmates threw urine and feces into his cell. *Id.* at 165. The plaintiff's wheelchair was removed for a limited period, by order of a psychologist, to ensure the safety of the inmate, and returned the following day after another examination by the psychologist. *Id.* Also, the plaintiff in *Shakka* presented no evidence suggesting that the Warden or the Chief of Security had any knowledge that the plaintiff was deprived of his wheelchair or that the defendants deliberately ignored the plaintiff's serious medical needs. *Id.* at 167 & n. 4. As to plaintiff's ability to shower after having urine and feces thrown on him, the panel in *Shakka* recognized that the plaintiff was given water and cleaning materials with which to clean himself and his cell immediately after informing prison officials of the assault. *Id.* at 168

■■■ Viewing the evidence in the light most favorable to the plaintiff, plaintiff has shown that he was regularly deprived use of his wheelchair for extended periods of time, plaintiff was unable to shower, and that he was not allowed to use a cup in order to try to bathe by taking water out of his cell toilet or drinking fountain. Also, he developed bedsores which were not treated.

In addition, plaintiff demonstrated that defendants Irvin and Kruppner had knowledge of plaintiff's serious medical needs, and had knowledge that harm would result to plaintiff. Defendant Kruppner was dep-

---

**2.** Defendants also cite to *Amos v. Maryland Dept. of Public Safety*, 126 F.3d 589 (4th Cir. 1997). However, the judgment in *Amos* was vacated by *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). *See Amos*, —— U.S. ——,

118 S.Ct. 2339, 141 L.Ed.2d 710 (1998). The Court in *Yeskey* held that the ADA did apply to prisoners, but did not address whether the Act was a proper exercise of Congress' authority under section five of the Fourteenth Amendment. *Yeskey*, 118 S.Ct. at 1956.

uty superintendent for administration at Wende. As part of his duties, he was responsible for overseeing the medical care of all inmates in the facility. Defendant Kruppner was aware of the recommendations from health care providers that plaintiff receive physical therapy and be provided with assistive devices. Defendant Irvin was superintendent of the Wende Correctional Facility. He was responsible for the day-to-day operations of the facility. He was made aware of plaintiff's condition by letters from PLS and Amnesty International, and grievances that were filed on plaintiff's behalf by another prisoner.

For these reasons, defendants' motion for judgment as a matter of law is denied.

## B. Damages.

Defendants also argue that they "are entitled to judgment as a matter of law based on the jury's failure to follow the trial court's instructions" (Item 84, at 14). Defendants' motion points to three different areas where the jury failed to follow the court's instructions: (1) "the damage amounts ... are clearly the result of passion, sympathy, and pure speculation"; (2) the jury failed to follow the charge that nominal damages of at least $1.00 must be awarded in the event they found a violation, but no actual damages; and (3) the record does not support any basis for a finding of punitive damages based on the court's instructions (Item 84, at 14–15).

When the jury was charged on November 17, 1998, they were told that damages must be awarded that would justly and fairly compensate the plaintiff for any injury they believed he actually sustained as a direct consequence of the defendant's conduct if they found that plaintiff was entitled to recover from one or more of the

defendants.[3] The compensatory damages charge continued:

You shall award actual damages only for those injuries which you find that the plaintiff has proven by a preponderance of the evidence. Moreover, you shall award actual damages only for those injuries which you find plaintiff has proven by a preponderance of the evidence to have been the direct result of conduct by a defendant in violation of section 1983 or the ADA.

Compensatory damages are those that arise from actual and indirect financial loss, mental suffering, value of time, actual expense, and bodily pain and suffering.

The placing of a dollar value on pain, suffering and anguish is a difficult task. You must use your best judgment. However, although the nature of the proof of these matters is necessarily subjective, plaintiff is not entitled to recover damages based upon mere speculation or sympathy. They must be based on the evidence presented at trial, and only on that evidence. You may not award compensatory damages to the plaintiff in order to punish a defendant, but only to compensate the plaintiff for his actual loss.

If you should find that plaintiff is entitled to a verdict, you should award him a sum which will compensate him for any pain, suffering and mental anguish already suffered by him and proximately resulting from the injuries for which you find defendant liable.

(Item 76, at 47–48). The jury was then charged as to nominal damages:

If you find that the plaintiff has suffered any violation of his constitutional

---

**3.** The introductory paragraph of the compensatory damages charge read:

If you decide that the plaintiff is not entitled to recover from any of the defendants, you need go no further. Your verdict is no cause for action as to the defendants. If you find that the plaintiff is entitled to re-

cover from one or more of the defendants, you must award damages which you think will justly and fairly compensate the plaintiff for any injury you believe he actually sustained as a direct consequence of the defendant's conduct.

(Item 76, at 47).

rights, but that the plaintiff suffered no actual damages, then instead of the compensatory damages I've just discussed, the plaintiff is entitled to receive nominal damages. An award of nominal damages is proper where the plaintiff has shown no other injury except for the violation of his constitutional right or rights. In other words, if you find that a defendant denied the plaintiff adequate medical care but that the defendant's denial of treatment did not proximately cause any injury or damage, then you must award the plaintiff a verdict of one dollar, or some other nominal amount, as against such defendant.

(Item 76, at 49). This was followed by a charge on punitive damages which began: "If you award the plaintiff actual damages or nominal damages, then you may also make him a separate and additional award of punitive damages" (Item 76, at 50).

The jury returned a verdict finding that defendants Irvin and Kruppner violated plaintiff's rights under the Eighth Amendment (Item 77, at 1).[4] The jury then found that defendants Irvin and Kruppner were not entitled to qualified immunity (Item 77, at 2). The third question presented to the jury was whether they found "that the defendant's acts or omissions proximately caused any injury or damage to the plaintiff?" (Item 77, at 2). The jury answered yes as to both defendants Irvin and Kruppner. Question four then asked the jury "[w]hat amount of compensatory damages, in dollar amount, did the plaintiff suffer as a result of the defendant's actions?" (Item 76, at 3). The jury entered "$–0–" for both defendant Irvin and defendant Kruppner (Item 76, at 3). The jury verdict form directed the jury to skip

question five and proceed to question six.[5] Question six then asked whether "plaintiff proved that he is entitled to an award of punitive damages against any of the defendants who violated his constitutional rights" (Item 76, at 3). Once again, the jury answered yes as to defendants Irvin and Kruppner. The question then asked, "if you answered 'YES' what amount of punitive damages should be awarded?" (Item 76, at 4). The jury entered an award of $15,000 against defendant Irvin, and $10,000 against defendant Kruppner (Item 76, at 4).

A compensatory damages award of "$–0–" is not an award of compensatory damages. *See Action House, Inc. v. Koolik*, 54 F.3d 1009, 1012–13 (2d Cir.1995) (holding that under New York law punitive damages could not be awarded unless actual damages were found). However, punitive damages can be awarded in § 1983 cases absent a finding of compensatory damages. *Robinson v. Cattaraugus County*, 147 F.3d 153, 161 (2d Cir.1998); *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 431 (2d Cir.1995). The jury found that defendant Irvin and defendant Kruppner violated plaintiff's civil rights (Item 76, at 1). However, the jury was unable to assess the actual damages for which plaintiff should be compensated (*See* Item 76, at 3–4). When errors have been made, either by a trial court or by a jury, and compensatory damages are not awarded but punitive damages are, it is appropriate for the court to award nominal damages. *See Robinson*, 147 F.3d at 153; *LeBlanc–Sternberg*, 67 F.3d at 431; *Gibeau v. Nellis*, 18 F.3d 107, 110–11 (2d Cir.1994); *Smith v. Coughlin*, 748 F.2d

4. Question number one of the jury verdict form read:

Do you find that any one of the defendants listed below violated plaintiff's rights under the Eighth Amendment?

| | | | | |
|---|---|---|---|---|
| F. | IRVIN | YES \_\_\_\_ | NO \_\_\_\_ |
| D. | WOLFF | YES \_\_\_\_ | NO \_\_\_\_ |
| S. | KRUPPNER | YES \_\_\_\_ | NO \_\_\_\_ |

5. Question five related to nominal damages and was to be completed only if the jury

answered "yes" to question one and "no" to questions two and three (Item 76, at 3). If these conditions were met, the jury verdict sheet stated that they "are required to enter on the line below an award of nominal damages in the amount of ONE DOLLAR ($1.00), or some other nominal amount"(Item 76, at 3).

783, 789 (2d Cir.1984). Accordingly, nominal damages will be awarded to the plaintiff in the amount of $1.00 from defendant Irvin, and $1.00 from defendant Kruppner.

## III. Defendants' Motion for a New Trial.

■ Defendants move for a new trial pursuant to Rule 59(a) and (e) of the Federal Rules of Civil Procedure on the grounds that: 1) the jury reached an inconsistent verdict based on insufficient evidence; 2) the compensatory damages award is excessive; and 3) the punitive damages award is not supported by the evidence. Defendants correctly point out that the court should grant a motion for a new trial if it is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998) (quoting *Smith v. Lightning Bolt Prod.*, Inc., 861 F.2d 363, 370 (2d Cir.1988)), *petition for cert. filed*, —— U.S. ——, 119 S.Ct. 1803, 143 L.Ed.2d 1007 (1999). "[A] motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Id.* (internal citations omitted). In considering the motion, the trial judge may weigh evidence herself, and need not view it in the light most favorable to the prevailing party. *Id.*

### A. Inconsistent Verdict and Insufficient Evidence.

■ Defendants contend that the jury found supervisory liability for defendants Irvin and Kruppner without finding liability on the part of the specific officers involved (item 84, at 15–16). Defendants also note that the jury found liability for these two defendants without assessing liability on defendant Wolff, the Deputy Superintendent for Security, who was responsible for supervising and training each officer assigned to the facility (Item 84, at 15–16). In support of their argument, defendants point to *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571,

89 L.Ed.2d 806 (1986) (per curiam), which holds that a claim of supervisory liability cannot be sustained if a jury concludes that a plaintiff suffered no constitutional violation at the hands of the supervised officer.

There are significant distinctions between *City of Los Angeles* and this case. In *City of Los Angeles*, the jury returned a verdict in favor of the supervised officer. *Id.* at 798, 106 S.Ct. 1571. The claims against the individual officers in this case, however, were withdrawn prior to trial (*See* Item 74). This does not mean the question of supervisor liability cannot be sent to the jury. When an Eighth Amendment claim is submitted to the jury, the jury must establish a link between the individual behavior of the supervised employees and the defendants. *See Gentile v. County of Suffolk*, 926 F.2d 142, 152 (2d Cir.1991). The basis of the claim is not whether individual officers violated the plaintiff's rights, but whether defendants are liable for any violation of plaintiff's rights that took place because of their supervisory authority or their failure to rectify the violation. *See id.* at 154.

■ Supervisors may be personally liable for the constitutional violations of their supervisees. A supervisor may be held personally liable if one of the following criteria are met:

> 1) The supervisory official, after learning of the violation, failed to remedy the wrong; 2) the supervisory official created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or 3) the supervisory official was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Spencer v. Doe*, 139 F.3d 107, 112 (2d Cir.1998); *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986). This standard was included as part of the third element of the Eighth Amendment standard in the jury charge (Item 76, at 29). The Eighth Amendment charge also included a charge

of inadequate medical care and a charge as to plaintiff's conditions of confinement (Item 76, at 24–28).

Here, there was ample basis for the jury to find that defendants Irvin and Kruppner were aware of, and failed to correct, Eighth Amendment violations. Irvin was superintendent of the facility and had knowledge of plaintiff's medical condition. Kruppner was deputy superintendent for administration, and was aware of plaintiff's medical needs and the recommendations that plaintiff receive therapy and assistive devices. *See supra*, Pt. II.A.

## B. Compensatory Damages.

■■■ Defendants also argue that the jury verdict awarding plaintiff $125,000 in compensatory damages against the State of New York for violations of the ADA is excessive (Item 84, at 18). The determination of damage awards is within the province of the jury. *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 66 (2d Cir.1998); *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir.1990). Damage awards should only be set aside if the award is "so high as to shock the judicial conscience and [the award] constitute[s] a denial of justice." *Ismail*, 899 F.2d at 186; *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir.1988). The jury's award against the State of New York is not excessive.

The ADA limits the amount of compensatory damages against an employer who employs more than 500 employees to $300,000. 42 U.S.C. § 1981a(b)(3)(D). The jury award granted to plaintiff clearly falls under the statutory ceiling. In addition, it is not excessive in light of awards granted by other juries under the ADA. *See e.g., Bizelli v. Parker Amchem*, 17 F.Supp.2d 949, 953 (E.D.Mo.1998) (upholding jury verdict of $500,000 in compensatory damages that exceeded ADA statutory limitation); *Franz v. Kernan*, 951 F.Supp. 159, 165 (E.D.Mo.1996) (reducing jury award in excess of $150,000 to $100,000 statutory cap for employers employing between 101 and 200 employees).

The jury heard evidence that plaintiff was denied use of his wheelchair for extended periods of time. They also heard evidence that plaintiff had a difficult time bathing himself because the facility did not have shower facilities that could accommodate a wheelchair bound individual. In order to bathe and to clean his bedsores, plaintiff often used a cup to take water from the commode located in his cell. This occurred because the sink in plaintiff's cell was inaccessible to him because of his wheelchair. Rather than providing plaintiff with the appropriate means to bathe himself, the jury heard testimony that prison officials would remove the cup from his cell and turn off the water.

Plaintiff was also denied outdoor recreation during the entire period of this suit. While there was some testimony that plaintiff was occasionally moved to a recreation room, he was never provided with his one hour of daily outdoor recreation that all inmates are entitled to receive. To accommodate plaintiff, prison officials would only have had to move plaintiff and his wheelchair down one or two steps.

■■■ The purpose of damages is to compensate the plaintiff for an injury caused by a defendant. *Carey v. Piphus*, 435 U.S. 247, 254–55, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *see Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Compensatory damages indemnify the injured party only for the injury sustained, in order to "make good or replace the loss caused by the wrong or injury." *McMillian v. F.D.I.C.*, 81 F.3d 1041, 1055 (11th Cir.1996) (internal citations omitted); *Reese v. United States*, 24 F.3d 228, 231 (Fed.Cir.1994). This includes not only out of pocket losses and economic injury, but compensation for non-monetary injury, such as any pain and suffering realized by the plaintiff. *Stachura*, 477 U.S. at 306–07, 106 S.Ct. 2537. Simply put, compensatory damages make the injured party whole. *See McMillian*, 81 F.3d at 1055;

*see also Reynolds v. Pegler,* 123 F.Supp. 36, 38 (S.D.N.Y.1954), *aff'd,* 223 F.2d 429 (2d Cir.1955). The jury award compensated plaintiff for the injury he suffered.

Accordingly, defendants' motion for a new trial to assess plaintiff's compensatory damages award is denied.

## C. Punitive Damages.

 Defendants also seek a new trial on grounds that the punitive damages award against defendants Irvin and Kruppner is not supported by evidence (Item 84, at 18–20). Punitive damages are awarded "to punish [defendants] for [their] outrageous conduct and to deter [them] and others like [them] from similar conduct in the future." *Smith v. Wade,* 461 U.S. 30, 54, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (citation omitted). Punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. 1625; *see also Mathie v. Fries,* 121 F.3d 808, 815 (2d Cir.1997). As already noted, damage awards, whether compensatory or punitive, should only be set aside if they "shock the judicial conscience." *Ismail,* 899 F.2d at 186; *O'Neil,* 839 F.2d at 13.

 The jury's award of punitive damages against defendants for being deliberately indifferent to plaintiff's serious medical needs was clearly supported by the evidence. For example, the evidence showed that plaintiff repeatedly requested permission from defendant Irvin to use his wheelchair in the Special Housing Unit, and these requests were denied. The evidence also showed that plaintiff filed a grievance seeking treatment for open bedsores. Plaintiff was informed that this was outside the scope of the grievance process. PLS intervened on plaintiff's behalf to seek treatment for his bedsores, and for use of his wheelchair. While PLS was informed that prison officials were modifying the facility so that it would be wheelchair accessible, it took more than 22 months for a ramp to be built.

Accordingly, defendants' motion for a new trial on the ground that the award of punitive damages was excessive is denied.

## IV. Remittitur.

 As alternative relief, defendants also request remittitur. Remittitur is appropriate when the court can identify an error which caused the juror to include a quantifiable amount in the jury verdict that should have been excluded, or when an award is " 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular quantifiable error." *Shu–Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984) (internal citations omitted). Based on the facts in this case, defendants allege that the jury award is "intrinsically excessive." The trial court can remedy this error by "reduc[ing] the verdict to the maximum amount a jury could have awarded, [or by] reduc[ing] it to what they believe a properly functioning jury would have awarded." *Id.* at 49–50 (citations omitted).

 Remittitur is not appropriate in this case. As previously noted, the jury's verdict is not "intrinsically excessive." The compensatory damages award against the State of New York falls far below the statutory ceiling of $300,000. *See* 42 U.S.C. § 1981(a)(b)(3)(D). Furthermore, the punitive damages awarded against defendants Irvin and Kruppner does not "shock the judicial conscience."

The Supreme Court, in *BMW of North America v. Gore,* 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), established guideposts to help courts assess whether a punitive damages award is excessive. These are: 1) the degree of reprehensibility of the tortious conduct; 2) the disparity between the harm or potential harm suffered and the punitive damages awarded; and 3) and the difference

between this remedy and the civil penalties imposed in comparable cases. *Id.; see also Lee v. Edwards,* 101 F.3d 805, 809 (2d Cir.1996).

The jury has already determined the degree of reprehensibility for defendants' conduct by awarding plaintiff punitive damages. *See Lee,* 101 F.3d at 809. By finding that defendants were deliberately indifferent to plaintiff's serious medical needs, the jury found that defendants Irvin and Kruppner acted with malice. Furthermore, the evidence shows that there were repeated instances of this conduct for more than a year. Defendants' conduct supports a punitive damages award.

Because no compensable damages were found by the jury, only a small punitive damages award is appropriate. *Cf. Lee,* 101 F.3d at 805. In comparison to civil or criminal penalties, the court is aware that penalties in § 1983 cases can far exceed the punitive damages award that was granted to plaintiff. In *Lee,* 101 F.3d at 812–13, a Second Circuit panel reduced a $200,000 punitive damage award to $75,000. In *Ismail,* 899 F.2d at 187, the panel determined that a $150,000 punitive damage award in a § 1983 case was not excessive. Similarly, in *King v. Macri,* 800 F.Supp. 1157, 1163 (S.D.N.Y.1992), the court found that a punitive damages award of $75,000 was not excessive. In light of these other holdings, the punitive damages awards against defendants Irvin and Kruppner are clearly not excessive. *See Walz v. Town of Smithtown,* 46 F.3d 162, 169 (2d Cir.1995) (punitive damage award of $9,500 not excessive).

Accordingly, defendants' motion for remittitur is denied.

## CONCLUSION

For the reasons set forth above, defendants' motion is denied (**Item 83**).

**So Ordered.**